Argued November 12, 1940; reversed April 1, 1941

# PATTERSON *v.* GETZ

(111 P. (2d) 842)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK and RAND, Associate Justices.

*J. S. Middleton*, of Portland, for appellant.

*Oscar Hayter*, of Dallas (Lester G. Oehler, of Corvallis, on the brief), for respondent.

ROSSMAN, J.   This is an appeal by the plaintiff from a decree of the circuit court which dismissed her complaint. One of the provisions of the decree follows:

"Inasmuch as this dismissal is without determination by the Court of the merits of the controversy between the parties hereto, this dismissal be without prejudice to the right of the plaintiff to bring action at law against the defendant for recovery of any sum or sums mentioned   *   *   *."

The reason for that disposition of the cause was a finding that no fiduciary relationship existed between the parties. Whether that finding was justified is the issue submitted by the appeal.

The defendant (respondent) is the son-in-law of the plaintiff, whose husband, William H. Patterson, died in December, 1929. Due to the fact that Mr. Patterson was a Columbia river pilot, the briefs refer to him as "the Captain." For the sake of brevity, we shall employ that designation.

The complaint avers that in 1919 the Captain received by inheritance $48,814.64; that he later received from the sale of a house, $3,500; that the Pattersons were unfamiliar with business matters; that the defendant had had business experience; that the plaintiff and her husband had confidence in the defendant's integrity and business judgment; that in April, 1920, the defendant borrowed from the Captain $22,000 with which he established an automobile agency in Corvallis; that following the defendant's venture in that enterprise the Pattersons reposed still greater confidence in him; that as a result the Captain loaned to the defendant additional sums of money; and that, so far as the loans are known to the plaintiff, they were, in addition to the original loan of $22,000:

| | |
|---|---|
| October 24, 1924 | $ 3,500.00 |
| April 30, 1927 | 5,000.00 |
| August 8, 1927 | 5,000.00 |
| October 26, 1927 | 10,000.00 |
| June 21, 1929 | 10,000.00 |
| March 18, 1929 | 15,000.00 |

The complaint alleges that the defendant borrowed from the Captain other sums totaling, after the deduction of repayments, $53,500. We now quote from the complaint:

"During all of such times the plaintiff herein and the said William H. Patterson reposed the utmost trust and confidence in the defendant herein; and entrusted him with the keeping of their books of account; relied

upon him to make their income tax returns and to attend to business matters generally for them; gave him access to the safe deposit box of the said William H. Patterson in which the notes of the defendant herein were kept; and generally, leaned upon the defendant herein as their fiduciary.''

Continuing, the complaint alleges that in December, 1929, the Captain died, leaving a will which named the plaintiff as executrix; that due to the plaintiff's unfamiliarity with business matters the defendant was appointed administrator with the will annexed of the deceased's estate, and that, as administrator, the defendant, without the knowledge of the plaintiff, failed to inventory the above notes aggregating $53,500. Next, it is set forth that in September, 1930, the defendant's net indebtedness to the estate, after deduction had been made of sums due him, was $53,383.38; that the rate of interest upon the indebtedness was six and one-half per cent; and that the defendant signed notes to evidence this obligation.

Having alleged that the defendant retained possession of some of the notes above mentioned, the complaint recites that the defendant, from time to time, signed renewal notes; that at various times, at the defendant's request, the plaintiff wrote ''paid'' upon notes; that no consideration was received by the plaintiff when she did so; and that in all of the above instances ''the plaintiff acted wholly upon the statement of the defendant to her made, in each instance that the action of the plaintiff in marking said notes 'paid' was a proper, natural and normal thing in the conduct of business, all as a result of the trust and confidence reposed by the plaintiff in defendant in his faithfulness and ability in handling her affairs and as her adviser and business representative.'' It is alleged that, be-

ginning in October, 1930, and continuing into the month of February, 1939, the defendant paid monthly to the plaintiff the sum of $289.16 as six and one-half per cent interest upon the aforesaid sum of $53,383.38, but that in May, 1938, he told the plaintiff that the aforementioned fund of $53,383.38 would soon be exhausted. In February, 1939, the plaintiff requested the defendant for an accounting and explanation of the fund, but the defendant furnished neither. Continuing, the complaint alleges that until late in the year 1938, the plaintiff made no effort to seek other counsel concerning her affairs, but relied wholly upon the integrity of the defendant and the oral reports which he gave her up to the time he advised her that the original fund was approaching exhaustion. The defendant, according to the complaint, never furnished the plaintiff with any accounting and is still indebted to her in the sum of $53,383.38. The only other averments of the complaint of which we need take notice allege that both an accounting and a discovery are necessary. The only part of the prayer which is material upon this appeal seeks an accounting and judgment for the amount to be shown due.

The answer admits that the defendant is the plaintiff's son-in-law; that in 1919 Captain Patterson received an inheritance; that in April, 1920, the defendant and his partner, A. R. Grout, borrowed from the Pattersons $22,000; that "at times he (defendant) assisted the plaintiff and William H. Patterson in preparing income tax returns and that at times he (defendant) had access to the safe deposit box of William H. Patterson;" that in December, 1929, the Captain died; that the defendant served as administrator of the Captain's estate; that, apart from some minor bequests,

the plaintiff was the beneficiary of the Captain's will; that the defendant from time to time signed renewal notes, and that "on or about March 1, 1938, to save the plaintiff from financial worry, the defendant told plaintiff that she was almost out of money but that she might have enough means to last from two to four years." All other averments of the complaint are denied. Answering further, it is alleged that between April 1, 1920, and April 1, 1929, the defendant and A. R. Grout, as partners, "and the defendant individually," borrowed from the Captain sums of money aggregating $70,500, and in the same period, "but at exact dates now unknown to defendant," repaid to him $48,500, leaving an indebtedness on June 1, 1929, amounting to $22,000, evidenced by notes bearing six and one-half per cent interest. Next, the answer says that from July, 1929, to and including December, 1929, the defendant paid to the Captain $250 monthly; that the defendant paid to the plaintiff:

| | |
|---|---|
| January 1, 1930 | $250.00 |
| February 1, 1930 | 250.00 |
| March 1, 1930 | 172.50 |
| April 1, 1930 | 267.50 |
| May 1, 1930 | 267.50 |
| June 1, 1930 | 267.50 |
| July 1, 1930 | 275.95 |
| August 1, 1930 | 275.95 |
| September 1, 1930 | 302.37 |
| October 1, 1930, to and including February 1, 1939 | 289.16 |

It is averred that the total payments aggregated $32,834.43, and not only discharged the unpaid balance of $22,000 and all interest requirements, but also overpaid the plaintiff beginning with the payment made on December 1, 1937. The reply denied the new matter.

The findings of fact recite:

"* * * during the lifetime of William H. Patterson, the defendant, being the son-in-law of said Patterson and sustaining friendly relations to the said William H. Patterson and the plaintiff, the said William H. Patterson did repose trust and confidence in the defendant, and the defendant did from time to time assist the said William H. Patterson and the plaintiff in various business affairs; * * * after the death of said William H. Patterson certain of the said promissory notes mentioned in these Findings were from time to time renewed by the defendant; * * * no trust relation, either expressed, resulting or constructive, existed between the defendant and William H. Patterson or the plaintiff, but that the only relationship whatsoever existing with reference to said money between the said E. L. Getz and the plaintiff and William H. Patterson was that of debtor and creditor; it is not necessary to a decision of this case for the Court to decide as to whether or not the loans mentioned in the pleadings and described in these Findings have been paid by the defendant."

The findings state that since no trust relationship existed between the parties, the plaintiff was not entitled to an accounting.

The circuit court's disposition of this cause left undetermined the question as to whether or not the defendant is indebted to the plaintiff. We shall also leave that question undetermined. The only issue submitted to us is whether the plaintiff is entitled to an accounting. We shall confine our attention to that single issue. The defendant (respondent) agrees that only this single issue is presented by the appeal. From his brief we quote:

"It should be apparent from the manner in which this appeal arose that the whole question on appeal is one of procedure. The plaintiff has refused to continue

her case in the forum which was (and is still) open to her—that is, as an action at law. Instead she is insisting upon her right to seek redress in the particular forum she has chosen—the equity court.''

Therefore, mention by us of sums and amounts will not be intended as a determination of indebtedness.

We have read the transcript of evidence and have examined all of its accompanying exhibits. The story told by the record, so far as it speaks of the trust and confidence reposed in the defendant by the Pattersons, is not unlike that recited in the complaint.

In 1911 the defendant married the Pattersons' daughter and thereby, of course, became their son-in-law. In 1918 an aunt of the Captain residing in Marysville, California, died, and from her estate he became entitled to receive the bequest mentioned in the pleadings. There were several other devisees and apparently it was planned to divide the estate among them without reducing all of the assets into cash. When the subject was broached to the Captain he distrusted his ability to deal with the matter unless he had the aid of a person versed in the ways of finance and business. Captain Patterson's schooling had been limited to the first seven grades of a frontier school. It was difficult for him, so the defendant averred, to add. He shunned the task of writing, and was distrustful of his business judgment. Due to these limitations, the Captain asked his son-in-law, the defendant, to accompany him when he went to Marysville for the purpose of conferring with the representatives of the estate; in fact, they went there more than once. Upon one of these visits they effected an agreement whereby Captain Patterson obtained his share of the estate. At that time the defendant prepared for his father-in-law an itemized

statement entitled "Captain Patterson's share—Approximate Value" and in it he listed, item by item, the cash, bonds, corporate stock, negotiable instruments and other properties which the estate offered the Captain as his share. On the same sheet the defendant entered the value of each item and the income which it was producing. This sheet showed a total value of $51,507.80, a tax of $2,693.16, and a net value of $48,-814.64. About the same time the defendant prepared for his father-in-law another compilation of data concerning the estate. The Captain preserved both of these papers; they are among the exhibits. After the bequest had been received the defendant helped the Captain reduce the noncash items into cash. In the process a contract had to be drafted and signed. The defendant helped in arranging its terms and conditions. He assisted as late as 1928 in reducing some of the inherited items into cash. We mention these matters because they show that at the very inception of the fund, which eventually brought on the present suit, the defendant acted as the financial agent and adviser of the Captain. There were other relatives to whom the Captain could have turned for advice; his mother, who was a woman of some means, was still living; he had a brother-in-law, a son and a daughter. But the record shows that he consulted only with the defendant. The latter agrees that his father-in-law had confidence in him.

Shortly after the Captain had received the aforementioned bequest, which, as reduced to cash, amounted to $48,764.92, he retired from all employment. He was then 62 years of age. In 1924 the Pattersons sold a piece of real property for $7,000, $4,000 of which was paid at the time of the sale. In the same year a policy of life insurance was surrendered which yielded $2,-

336.12. The Captain also owned $3,000 of United States bonds, and in 1927 or thereabouts his mother gave him $5,000. The above constitutes the funds which precipitated this controversy.

Beginning with the year 1919 and continuing on to the Captain's death, the defendant prepared his father-in-law's income tax returns. He explained, "It was very difficult for Captain to write." Likewise, from time to time, the defendant computed the interest payable to the Captain upon some notes received from the deceased aunt's estate. On other occasions he helped his father-in-law invest money in securities. The defendant had a key to the safe deposit box in which the Captain kept his valuable papers; at times he went to the vault alone and at still other times he accompanied the Captain there. Upon a flyleaf in the Captain's checkbook he listed for him his bond holdings. It appears that occasionally the defendant wrote the Captain's checks and made the necessary entries upon the stubs. One of these entries was for a check for $34,000.

The manner in which the defendant had become the Captain's financial agent is illustrated by the following telegram he sent to the Captain in 1921 when the latter was temporarily in San Francisco:

"Wilcox should have paid $120.54 interest in full to Feby first and $1317.60 on principle, total $1438.14 per agreement to pay one-fifth annually. This was verbal agreement as note maturedlast Feby. Carlin drew it so you would always have foreclosure privilege if necessary. He always paid $42.40 on principle and interest to November fifth. I have his note here but contract and stock must be in Portland vault. Your contract and Jim's are same but wire if you want yours and will get it from Portland. Would advise asking him for additional $484.78 thereby having it paid to date per agreement. Letter following."

A letter, written by the defendant to the Captain November 18, 1922, further illustrates the relationship. From it we quote:

"I was in Portland for a little while yesterday and took up the matter of the lost Bond coupons with the United States National while there. * * * This morning am in receipt of a letter from them which is self explanatory and which I am enclosing herewith. * * * Am writing them today that I will take possession of coupons and place them back in vault on my next trip to Portland. You will note that they are debiting your account with the amount of these coupons so you will have to, therefore, deduct $106.25 from your bank balance."

A letter written to Captain Patterson by his attorney, W. M. Cake, also manifests the manner in which the defendant had become Captain Patterson's financial agent. We quote from this letter the following, with the explanation that the name Roy therein refers to the defendant:

"I was out of the city when Roy telephoned to the office about your interest. * * * If you desire you might have this money sent to Roy instead of to me * * * I have the abstract, mortgage and insurance policy here in the office * * *."

Likewise, when there was paid the surrender value of the Captain's aforementioned life insurance policy, the check came into the defendant's hands. For instance, in October, 1924, he wrote:

"Dear Captain:
"I am enclosing herewith the check from the Minnesota Mutual Life, together with their letter accompanying same * * *."

When the Captain sold the item of real property mentioned in a preceding paragraph, he and the de-

fendant were temporarily in Seaside. A telegram had to be sent to the real estate agent and another to the Captain's attorney. It was the defendant who prepared both. Concerning another transaction, the defendant wrote to the Captain:

"I am enclosing herewith Wilcox's contract, but I am holding his note here together with the Marysville stock * * *."

As late as 1928 the defendant made a trip to California on behalf of his father-in-law to dispose of some corporate stock. While there he wrote to Captain Patterson explaining what he had done and enclosing a contract for the Captain's signature. December 3, 1928, he sent to his father-in-law a letter which says:

"The proxy which I received this morning is relative to a stockholders' meeting which is necessary to ratify the action of the board regarding liquidation. * * * I have filled in Jim's name on the proxy, and will you please sign it, Captain, and * * *. I left full instructions with Jim just how to vote it * * *."

The defendant swore that he never asked for any compensation for the various services which he performed for the Pattersons.

We shall now mention the inception of the borrowings and their development. The kind of vocation which the defendant had pursued prior to 1920 is not disclosed by the record, but in April of that year he and A. R. Grout formed a partnership for the purpose of establishing an automobile agency in Corvallis. In order to enable them to enter upon this venture, the Captain loaned them $22,000 upon their unsecured note. The record indicates that he deemed the defendant as the borrower. Grout was not a factor in any of the transactions which concern us. The defendant has destroyed

all writings pertaining to the initial loan, but testified that as compensation for lending the money the Captain was paid $150 per month. It is agreed that the loan was later repaid. Seemingly, the Captain made no record whatever of this transaction. In fact, he kept no account books or records of any kind. Only two scraps of paper are before us which bear his signature. One is merely a sample of his signature. The other is a paper he signed incidental to the California estate. Following the $22,000 loan the Captain's confidence in the defendant's ability and integrity increased. After the defendant had established himself in business in Corvallis he made his home there. The Pattersons lived in Portland.

We have just mentioned the fact that the Captain kept no records. His transactions with the defendant were many and they involved thousands of dollars, yet he made no entries whatever concerning any of them. The only conclusion which it is possible to draw is that he depended upon the honesty of his son-in-law and expected him to maintain the necessary records.

The defendant swore, "I have no records back of March 30, 1929, and I could not by memory tell how or when." He swore that he habitually destroyed paid notes as soon as they were returned and that in March of 1929 he destroyed all records concerning his transactions with the Captain. In that month, however, he borrowed from the Captain $15,000. In fact, in that month his indebtedness to the Captain was $48,500, according to his own admissions, and $53,500, if the plaintiff's evidence is believed. After the Captain's death in the latter part of 1929, the defendant maintained a record of his transactions with the plaintiff upon a sheet in his ledger. This sheet was kept intact

until some time in 1937 whereupon the defendant destroyed it. His explanation follows: "When final payment was made, that was pulled from the ledger." The plaintiff, of course, claims that final payment has not yet been made, and, as we shall shortly show through quotation of the defendant's own words, he was constantly inducing the plaintiff, as late as May, 1938, to believe that he still owed her $50,000 or more.

The plaintiff had a roughly-bound book of 500 pages which she kept as a sort of combination diary and account book. The first writing in it was made in 1917. In it she wrote occasional items of family interest and many entries of household expenditures. Here and there she wrote something concerning the notes signed by the defendant. Some of the household entries concerned only two cents, and many recorded the expenditure of carefare, six cents. The unimportant entries were apparently made with accuracy, but the larger ones, that is, those pertaining to the loans made by the Pattersons to the defendant, were sometimes erroneous to the extent of a thousand dollars or more. The inapt language of the notations concerning the loans renders their meaning difficult to grasp. The entries were such as might be expected to be made by a person who had had no business training whatever. The plaintiff had none. Judging from the frequency with which the word "stockings" appears in the book, one may be warranted in assuming that their purchase troubled the plaintiff more than her transactions with the defendant. A novel feature of the book was the entry upon the same page of transactions two and three years apart in point of time. Very likely the entries were made in chronological sequence, but were scribbled wherever a vacant space presented itself. Pages con-

taining records are separated in many instances by a score or more of blank pages. The plaintiff, who at the time of the trial was 78 years of age and in enfeebled health, swore that she made the records concerning the transactions between the defendant and her husband whenever the latter told her about them. Her husband did not know that she was keeping such a book. In fact, so far as the record discloses, only the plaintiff and the defendant were aware of the book's existence. The defendant himself made one of the entries in it. The information for the entries which the plaintiff made after the Captain's death concerning her dealings with the defendant was given to her by the latter. These scribblings, however, failed to refresh her recollection. Possibly this was due to the fact that she had never possessed sufficient knowledge of the transactions. But, be that as it may, this book and the other records which we shall shortly describe were the only evidence available. The entries in the book are incomplete. For instance, nothing was written concerning payments which the plaintiff received from the defendant. In order to give a better impression of the nature of the entries, we shall now quote one of them, explaining that where the name Roy appears, reference was to the defendant:

"The 24th of March, 1936, I gave Roy twelve thousand dollars to keep in his safe. I keeping thirteen thousand, in notes, then, he, Roy, still has twenty five thousand dollars besides in notes which he is retaining, so he has in all thirty-seven thousand dollars in notes, holding them for me, but indebted to *me* for them. Holding these because of the U. S. Governments high rate of tax against them."

We shall now return to the loans. After the initial loan of $22,000 was made to the defendant and his

partner, other loans were made. The defendant admits the following:

| | |
|---|---:|
| October 24, 1924 | $ 3,500.00 |
| April 30, 1927 | 5,000.00 |
| August 8, 1927 | 5,000.00 |
| October 26, 1927 | 10,000.00 |
| June 21, 1928 | 10,000.00 |
| March 18, 1929 | 15,000.00 |
| Total | $ 48,500.00 |

The loan of March 18, 1929, was the last, but from time to time renewal notes were signed. It may be well to repeat at this point the defendant's following statement: "I have no records back of March 30, 1929." None of the notes given at the time of these borrowings are now in existence. The defendant claims that he destroyed them. The evidence which enables us to say that the loans were made, apart from the defendant's admissions, is a check signed by the plaintiff and drawn against the Pattersons' joint bank account, and five cashier's checks in the several amounts above mentioned. The resort which the Captain made to cashier's checks is perhaps evidence of his lack of knowledge concerning business practices. Bank records indicate that the sums represented by the cashier's checks were charged against the Captain's account, and the defendant admits that he received the sums. The plaintiff claims that, in addition to the above loans, one more was made—$5,000, March 18, 1929. Evidence furnished by her tends to support this claim.

A word or two concerning the purposes of these borrowings may not be amiss. The defendant claims that he borrowed these large sums so that the interest which he would pay upon them would increase the

Captain's income. He says that his father-in-law was dissatisfied with the small yield produced by his government bonds. For some years the defendant paid the Captain six per cent interest, but increased the rate in the spring of 1929 to six and one-half per cent. The following circumstances indicate that the purpose of the borrowings was the defendant's advantage. After the defendant had established his business in Corvallis he built a house there which became the family home. But there was a mortgage of $3,500 upon the property and an indebtedness of $1,500 to a bank. Shortly the Captain sold the aforementioned parcel of property and out of the proceeds loaned to the defendant $3,500 with which the mortgage debt was discharged. The note which he gave to the Captain bore six per cent interest and was unsecured. Interest upon it was payable semiannually. The interest on all of the other loans was payable monthly. The two $5,000 loans were made by the Captain to the defendant and Grout in order to enable them to retain their automobile paper. The two $10,000 loans were used by the defendant and Grout in order to enable them to purchase some stock of a Corvallis bank. The $15,000 loan enabled the defendant to dissolve his partnership with Grout and purchase the latter's interest therein. One of the terms of the dissolution agreement required the defendant to assume the payment of all of the aforementioned indebtedness.

We shall now consider the defendant's claim that he has paid in full all of these notes. Interest was regularly paid by the defendant. He sometimes deposited it in a bank to the Captain's credit. Renewal notes were made from time to time as existing notes matured. It will be observed that the above-listed notes total

$48,500. If the contested note of $5,000 is added, we have a total of $53,500. The plaintiff claims that on December 12, 1929, when her husband died, $53,500 was the amount of the defendant's indebtedness. The defendant claims that in the year 1928 he made various payments totaling $26,500 upon the indebtedness. We shall now recite the facts concerning that contention. If $26,500 was paid, the indebtedness had been reduced to $22,000 the first of 1929; provided the questioned $5,000 loan was never made; but if it too was made, the indebtedness at the beginning of 1929 was $27,000.

Since the defendant has retained no records except canceled checks issued subsequent to March 30, 1929, we have nothing to look to except his testimony in ascertaining whether his claim is true that he paid $26,500 in 1928. As a witness, he swore that those payments were made largely in bonds. He thought that possibly a check or two and some cash may have been used. He said that customers occasionally paid with bonds for cars which they purchased and that he had quite an accumulation of such securities in 1928. He also swore that from his wife's aunt, Louise Patterson, he obtained a loan of $20,000 in 1928 or thereabouts. Miss Patterson corroborated that statement; she, too, was vague about the year, but claimed that the $20,000 was given in bonds. The defendant then acquiesced in that modification and swore that he gave the $20,000 in bonds to the Captain. Shortly he recalled that the $20,000 payment was made in two installments, first a payment of $5,000 and later a payment of $15,000 in bonds. There is no documentary evidence that Miss Patterson owned $20,000 in bonds or that she gave them to the defendant. She said that when she made the loan she did not know why the defendant wanted it, and

that she did not inquire. How or when it was repaid, neither Miss Patterson nor the defendant said. The defendant testified that he discharged the $3,500 note with bonds also. He thought this was done in 1928. When he made this purported payment the Captain, according to the defendant, cautioned him. "Don't mention it to her," meaning the plaintiff. Although he paid the $3,500 obligation in full, if his testimony is true, he nevertheless continued to pay interest upon it for a year and a half. He did so, according to his testimony, "at Captain Patterson's request." About a year after having paid the $3,500 note, he signed a renewal note. His purpose in signing the latter, he said, was to deceive the plaintiff into a belief that the obligation was still outstanding. The above alleged payments aggregate $23,500, but it is the defendant's contention that in 1928 he paid $26,500. The following are his words which describe the payments of the purported additional sum: "Now, there was another item of $3,000 that it totaled, but I can not recall whether that was in one lump or two or three. My recollection is that I gave him some smaller amounts in cash, that is, in actual currency, but I don't think that was large. It might have totaled as much as a thousand dollars, but I don't know that. I think it was two times, and I might have paid him some money by check." The above is the manner in which the defendant says that in 1928 he paid $26,500 to the Captain, thereby reducing his obligation to $22,000, if the total borrowings were $48,500 at the beginning of the period. We repeat that in corroboration of his claim that in 1928 he paid $26,500 upon his obligation, the defendant submitted no documentary evidence. He produced no canceled checks, no canceled notes, no bookkeeping entries, no

receipts. Likewise, he produced no check stubs concerning any transaction. Grout, his partner, swore that so far as he knew, no payments upon principal were made prior to March 17, 1929, except for the discharge of the initial loan of $22,000, which it is conceded was paid. March 18, 1929, the partnership was dissolved. Accordingly, if the defendant's testimony is true, a very large sum of money was paid to the Captain which diminished the indebtedness of both partners without the knowledge of one of them. We add, however, that it is not certain how many of the original notes bore Grout's signature as a co-maker. Of course, if $26,500 was paid to him, the Captain received it, but there is nothing to indicate that it ever came into his hands, no deposit slips or other papers. In 1929 the Captain died and shortly the defendant, as administrator of the deceased's estate, prepared the inventory. This document mentions neither this large sum of money nor anything in which it may have been invested. Even the defendant, whose knowledge concerning all other items of the Captain's affairs seemed adequate, professed a total want of knowledge of what was done with the $26,500 after its alleged payment. He intimated somewhat obliquely that the Captain may have made some bad investments. In this intimation the defendant's wife and the aforementioned Louise Patterson joined.

The plaintiff denies that the defendant paid the aforementioned sum of $26,500 upon the obligation, and insists that at the time of her husband's death, in December, 1929, $53,500 was the amount of the outstanding unpaid loans. She further claims that the monthly payments have discharged nothing but interest.

We shall now review the evidence which the defendant contends shows that he paid the alleged balance of $22,000 which remained after the purported payment of $26,500.

Month by month the defendant made payments to the Captain during the latter's lifetime. Monthly payments of interest were required by the terms of the notes, with the exception of the $3,500 one upon which interest was payable semi-annually. The monthly remittances varied in amount occasionally, except in the last eight and one-half years. Of course, since the defendant destroyed all of his records including the ledger sheets which pertained to these transactions, our only information concerning the remittances comes from the defendant's tongue, whatever canceled checks he preserved, the deposits in the Pattersons' bank accounts, and the plaintiff's account book. The fact that the monthly remittances varied in amount was due, in part, to the fact that the total of the loans was not uniform. There is nothing in the record which indicates that either the Captain or his wife were consulted in regard to the amount of the remittances. They obviously depended upon the defendant to do all the bookkeeping and make the necessary calculations. In October, 1930, the defendant's final account as administrator of Captain Patterson's estate was filed, although he was not discharged as administrator until May 5, 1932. Beginning in October, 1930, the defendant began to remit to the plaintiff monthly $289.16. He continued to do so to and including February 1, 1939. The plaintiff claims that during the course of the probating of her deceased husband's estate $116.62 became due the defendant and that in this way his total indebtedness of $53,500 to the estate was reduced to $53,383.38. Since the rate of

interest payable upon the loans was six and one-half per cent, the monthly remittance of $289.16 was the required amount of the monthly interest upon $53,-383.38. In this way the plaintiff accounts for the size of the monthly payments of $289.16; and, of course, if it was interest only, these payments did not reduce the principal. The defendant denies that $116.62 or any other sum was due him from the estate, and, as we have already said, denies that he owed the Captain $53,500 at the time of the Captain's death. The defendant claims that he arbitrarily selected $289.16 as the amount of his monthly remittances. Before his remittances were in that sum he had paid $250 a month for several months, and he claims that when the plaintiff told him that her monthly needs required more than $250, "I arbitrarily stepped up those payments" to $289.16. He added, "and with no rhyme or reason that went on and continued and became a habit." He does not claim that the plaintiff was consulted when he selected that odd amount as the sum to be paid monthly.

Pursuing further the subject of payment, the defendant claims that after the alleged payment of $26,-500 had reduced the amount of his indebtedness to the Captain to a balance of $22,000, monthly remittances, which included not only interest, but also some principal, reduced the amount to $21,194.14 at the time of the Captain's death. From the time of the death to October, 1930, the defendant paid to the estate monthly remittances which varied in amount, but which he claims reduced his indebtedness to $19,873.39. He further claims that his aforementioned monthly remittances of $289.16, the first of which was made on October 1, 1930, and the last on February 1, 1939, discharged the indebtedness in full on November 1, 1937.

If this is true, he then continued to pay $289.16 monthly for one year and three months after he had discharged his debt.

The above is a review of the evidence which indicates whether or not the obligations have been paid. Let us now consider whether or not the defendant sustained a fiduciary relationship to the plaintiff after her husband's death.

When Captain Patterson died, December 12, 1929, he left a will which nominated the plaintiff executrix of his estate. However, the plaintiff and the defendant signed a petition which averred: "That said Agnes S. Patterson, because of her health and other conditions, does not desire to act and is not able to act as Executrix of the estate of said deceased, but desires that your Petitioner, E. L. Getz, be appointed." He was appointed. In the inventory of the estate which he filed, his only mention of his indebtedness to the estate is the following: "Due upon open account from E. L. Getz, Corvallis, Oregon, $10,000.00." The plaintiff swore that she never saw the inventory nor the appraisement. The defendant claimed that the Captain had had approximately one-half of the renewal notes made payable to the plaintiff and that, since he (defendant) regarded an unsecured note in the nature of an open account, he treated the $10,000 of notes payable to the Captain as "open account."

After Captain Patterson's death the defendant continued to attend to the plaintiff's affairs in the same manner as he had the Captain's. From one of his letters, written in 1934, we quote:

"First; About the enclosed lease. I would substitute the enclosed typewritten paragraph in place of the sentence they have written in at the beginning of

the lease. Then I would eliminate entirely the two paragraphs I have numbered one and two. The amount of rental on this type of lease is  *   *   *. Then paragraph two should be eliminated because  *   *   *''

From another of his letters the following is taken:

''I will get income tax returns made out and paid and I will then forward checks to you after making payment. I don't know what the state tax will be. They have materially reduced exemptions  *   *   *. The state tax is due in two installments and I will pay only the first installment this time.  *   *   *''

In another letter he wrote:

''Regarding your taxes; I received the tax statements from you O K.  *   *   *  As per my itemization, you will see that your total tax came to $261.93 which I paid in full, leaving $27.23 due as of March first, to this I have added check for April 1st of $289.16 and included this latter amount with cashier's check which is enclosed because if I delayed until the first I was very sure it would not reach you. I took the discount on property taxes and paid them in full as it figured cheaper than to pay them in four quarters. I succeeded in chiseling your state tax down from $312 to $43.44. I will explain how I did it when you get home so that our stories agree in case the statement is ever audited.''

More statements of like kind could be quoted.

Other evidences of a different kind likewise show that the defendant had assumed a fiduciary relationship toward the plaintiff. For instance, Miss Grace Connick, a nurse, who took care of the plaintiff in 1937 during a period of illness, described her first meeting with the defendant thus: ''Mr. Getz came to the door, to my bedroom door, and wanted to know the condition of Mrs. Patterson, and in the time of the conversation

he said that he wanted me to know that he had handled Mrs. Patterson's affairs for twenty-five years * * *." This testimony was neither contradicted nor challenged.

The defendant continued to have access to the safe deposit box and from time to time availed himself of the right. After the Captain's death he prepared the plaintiff's income tax returns. He not only prepared the returns, but signed them and kept the copies. On the return for 1930 he wrote: "Taxpayer unable to make return—affairs handled by agent below." By "agent" he meant himself. Upon the return for 1931 he wrote: "Taxpayer crippled and unable to make return conveniently." Upon the 1932 return he wrote: "Agent thoroughly conversant with taxpayer's affairs." Following these statements he signed the plaintiff's signature by himself as agent. Other returns bore similar explanations. At times he paid the plaintiff's real property taxes.

While the defendant's knowledge concerning the plaintiff's affairs appears to have been complete, he concedes that his principal had inadequate knowledge concerning the notes. We quote from his brief: "It must be clear that plaintiff had no real knowledge of the amounts of these larger loans to defendant."

From time to time the defendant deposited money to the plaintiff's bank account. At other times, at the plaintiff's request, he sent money to her son who was then attending an eastern educational institution. In December, 1933, when the plaintiff was visiting in the defendant's home a will was drafted for her by an attorney whose office was in Corvallis and whose services were secured by the defendant. This attorney, whose professional standing is all that it

should be, regularly took care of the defendant's business. But when defendant chose him, he passed up Stephen Matthieu of Portland, an attorney for good standing, who was a distant relative of the plaintiff, and who had several times taken care of the professional wants of the Pattersons. The will thus drafted contained provisions very favorable to the defendant. The plaintiff signed it. In mentioning this incident, our sole purpose has been to show the extent to which the defendant acted as the plaintiff's adviser and confidant.

In May, 1938, the plaintiff made another visit to the defendant's home. It was her last. It may be well to pause and observe that the Pattersons and the Getzes exchanged many visits. In fact, all of the above-mentioned notes were signed in, and all of the aforementioned transactions took place in, the home of the one or the other. May 18, in the course of the above-mentioned visit, the plaintiff wrote to the Portland bank where her safe deposit box was located, requesting its officers to enter the box and remove from it "my will and notes signed by E. L. Getz in the amount of $15,000" and forward them to her. The letter further stated: "Please also cancel the name of E. L. Getz on my present safe deposit box contract." The bank did as directed, but stated that the box contained only $13,000 of notes signed by Getz. The defendant concedes that he suggested the phraseology of this letter, and that the plaintiff wrote it in his words. He explained that the plaintiff had asked him to go to the vault, secure the papers and return them to her, but that he did not care longer to enter the vault. Accordingly, so he said, the next time he was in Portland he consulted with an official of the bank and discovered

that the matter could be handled by a letter conferring upon the bank authority to open the box; hence the letter. Upon receipt of the will the plaintiff had another drafted which she shortly signed. The defendant consulted the same attorney who had prepared the first one and who, as we have said, was his regular legal adviser. The latter, at the defendant's request, called upon the plaintiff and after drafting the will gave it to the defendant for delivery to the plaintiff. The son-in-law swore that during the course of this visit the plaintiff repeatedly asked for his advice concerning this will, but that he consistently refused to give any. One of the provisions of the will follows:

"Heretofore, for some considerable period of time, my son-in-law, E. L. Getz, was indebted to me, such indebtedness being evidenced by promissory notes. I hereby declare that said E. L. Getz has caused his obligations to me to be satisfied and discharged by payment thereof in full  *  *  *."

This will was signed in the defendant's home while the defendant and his wife were in the house. The defendant himself had summoned one of the attesting witnesses. Our purpose in having mentioned the matters concerning these two wills has not been to insinuate that there was some irregularity about them, but only to evidence the fact that the defendant was the plaintiff's helper concerning even such an intimate matter as the making of a will.

In 1933 or 1934 the plaintiff entrusted the defendant with $500 for investment in the stock market. He was permitted to use his own unrestricted judgment. He returned it in a few months with a profit of $200.

Without reviewing the evidence further, we express our belief that the defendant undoubtedly possessed

the plaintiff's confidence. She reposed such trust in his integrity and business judgment that she consulted him to the exclusion of all others. He was not only her adviser—he attended to such matters as the making of income tax returns without even consulting her. He had the privilege of signing her name, of entering her safe deposit box, and twice he selected for her her attorney. She depended upon him to do the bookkeeping in connection with their business transactions. That was necessary because he had never given her enough information to enable her to make the proper opening entries in any books. Her entries in her memorandum book concerning these transactions were whatever she understood the defendant's directions to be. His monthly remittances were accepted by her without question as correct. As we shall shortly show, he induced her to believe that they were interest only—and she so believed.

Let us now consider how the defendant obtained possession of the last of the notes which he had given to the Pattersons, and also his reason for his alleged concealment from the plaintiff of the purported fact that much of the obligation had been retired before the Captain's death and that all of it was discharged by November 1, 1937.

In a preceding paragraph we stated that in May, 1938, while the plaintiff was visiting in the defendant's home, there was returned to her from her safe deposit box $13,000 of the notes signed by the defendant. It now develops that at that time the plaintiff did not possess notes of the face value of $53,383.38, but of the value of $22,000 only; $9,000 of them were in her home. As we have already indicated, the defendant contends that the payment of $289.16 which he made

in November, 1937, discharged the final remaining part of the debt. He, however, admits that the plaintiff was under the impression that the monthly remittances of $289.16 were interest only, and that she had no idea until he spoke to her upon the subject in May, 1938, that he claimed that any part of the principal had been retired. The following are his words: "It was my purpose to not inform her of her financial condition. Now, I am making this statement here, that through 1932 and in subsequent years I haven't any doubt that Mrs. Patterson believed that the total checks she received were interest payments, but they were part interest and part principal. * * * There is no doubt in my mind that Mrs. Patterson assumed that she was getting only interest, because she was under the impression that all of her money was left and she was receiving interest. * * * She was undoubtedly under the impression and on my statement she thought this money was all invested in automobile papers and that she was just getting returns from that * * *. She thought it was a return from investments in automobile paper * * *." That being true, and since the amount of principal required to produce $289.16 monthly at the rate of six and one-half per cent (which the defendant says was the agreed percentage) is $53,383.38, the defendant, by his above admission, inferentially concedes that the debt, at least at one time, was $53,383.38.

We now come to the defendant's explanation for the deceit which he says he practiced upon the plaintiff for a period of ten years, beginning in 1928. We have said that he claims that he paid in full the $3,500 note about a year prior to the Captain's death and that the latter at that time requested him not to

let the plaintiff know that payment had been made. We have also mentioned that he continued paying interest upon that note at the rate of $105 semi-annually for a year and a half after he claims he had made payment in full. These semi-annual payments were continued, according to the defendant's admission, a year or so after the Captain's death. The defendant conceded that prior to Captain Patterson's death he signed a renewal note for the $3,500 obligation. He says that all of this was done in order to conceal from the plaintiff the fact that the $3,500 note had been paid. It will also be recalled that the defendant claims that a total of $26,500 was paid to the Pattersons in 1928. He claims that he helped to conceal this fact also from the plaintiff. He swore that the plaintiff's husband on many occasions, including his deathbed, asked him to keep from the plaintiff any information concerning these payments, and that he promised to do so. His wife corroborated that statement. He continued to pay $289.16 per month even after the entire debt had been paid—assuming it to have been paid—in order to conceal from the plaintiff, so he said, the fact of payment.

According to the testimony of the defendant and his wife, his family repeatedly urged him to tell the plaintiff that his debt to her was virtually discharged. How it happened that everyone else knew the facts and yet the plaintiff and her daughter Edna, who was living with her, were both ignorant of them, was not explained. The defendant swore that in the course of the plaintiff's visit to his home in May, 1938, he finally yielded to his family's importunities and decided to tell the plaintiff concerning the payments upon principal. At that time the plaintiff was 76

years of age, enfeebled in health, and needed the assistance of crutches in moving about. Her daughter Edna was in Portland. Although the defendant claims that he gave the plaintiff an extensive explanation, he did not tell her that the debt had been paid in full. The following are his words: "I gave her only half an explanation, and that explanation ran over a period of about two months or thereabouts. I went through the arithmetical process of figuring this to show her, but I did not go to the end of it, and many, many times in these conversations, I should think over a period of a couple of months, she would ask, 'Well, just how much money have I got left?' and each time I have stalled, or avoided an answer to the question by saying, 'Well, you have got enough to go for three or four years and there isn't anything to be concerned about.' Because it was my intention to continue with these payments through her lifetime because my opinion was then and is now that she would not live very long. * * * That was for the purpose of endeavoring not to advise her that she had been completely repaid but to leave with her the impression that she had ample funds to continue her living situation as it had been in the past."

After the defendant had spoken to the plaintiff as above indicated, he told her that the notes which she still held ought to be marked paid. She thereupon so marked them. The following is his statement: "Upon this explanation and my request the notes were marked paid." The plaintiff's explanation of why she marked the notes paid follows: "He asked me to please write here, and I did it. * * * Well, there were two notes that were not due and he said then, 'Mother,' he said, 'you will have to trust me

for those.' I signed them too." After these notes, totaling $22,000, had been marked paid, the defendant assumed possession of them. Although he had destroyed from time all of the other notes, he kept these and they are the only ones which have become exhibits in this case. After this had been done the will was signed, from which we quoted the paragraph which admitted payment of all of the defendant's obligations. It seems that the plaintiff was only half persuaded when she marked the notes paid and signed the new will, for she at that time protested, "Well, what is the use, what is the good of making a will if you haven't got anything?"

Circumstances at variance with the defendant's claim that the monthly remittances of $289.16 contained a substantial amount of principal money are the income tax returns which he prepared for the plaintiff. It will be recalled that he not only prepared them, but signed them and kept the copies. He testified that in determining the amount of the income which should be entered in the returns, he consulted his own records. In the return for the year 1930 he reported the plaintiff's income as $3,365.91. He swore that of this total, $3,235.91 consisted of his twelve monthly remittances and that the balance of $30 was received by the plaintiff from another source. The defendant's practice of remitting monthly $289.16 was not started until October of 1930. The sum of $3,235.91 was the exact total of the defendant's twelve monthly checks, and since their total was reported by the defendant as taxable income, we have a circumstance for which the defendant is responsible and which is adverse to his contention that each monthly remittance included some principal. For the year 1931 the

defendant reported the plaintiff's income as $3,469.92 which is the exact amount of twelve times $289.16— a strong indication that at that time the defendant did not believe that his monthly payments were reducing the principal. After he had made these returns "it dawned upon me," so he swore, that the plaintiff's tax would be greater than it should be, hence, "I graduated it down by no exact method, but just lowered it from year to year."

Now, for a brief summary before stating our conclusions. The defendant, in his first relation to the moneys which he subsequently borrowed, helped the Captain get them together. These moneys, with his help, came from the California estate, from the surrender of the Captain's life insurance policy, from the sale of the Pattersons' Portland real property, and from the conversion into cash of securities. In helping to gather the funds together, the defendant prepared inventories, appraisements, contracts, wrote telegrams, prepared letters, computed interest, and in other ways served as the Captain's mouthpiece, representative and scrivener. The capable manner in which he discharged these duties apparently invited the Pattersons to repose additional confidence in him. And we next find him helping the Captain to write a check with which an investment was made and to reduce some of the corporate stock and promissory notes into cash. Then income tax returns had to be prepared, money had to be deposited in a bank, interest had to be figured, another business trip to California had to be made, and frequent visits had to be made to the Pattersons' safe deposit box. In all of these matters the defendant participated and much of this service was performed by him alone. In some

of the instances he acted as the financial adviser and in others as the personal representative of Captain Patterson. Had he in any of these instances sought to gain an advantage for himself at the expense of the Pattersons, the transaction would have been set aside upon the well-established principle that an agent will not be permitted to make a profit at the expense of his principal. Upon the Captain's death the circumstances suggested the performance by the defendant of another duty—he became administrator of the deceased's estate. The plaintiff, who had been nominated in the will as executrix, looked, as a matter of course, to the defendant to administer upon the estate. The two of them signed a petition for his appointment and he was appointed. He administered upon the estate without consulting the plaintiff. He had been the fiduciary of her husband and he now assumed a similar relationship to the plaintiff. Before the Captain's death the low return yielded by the bonds which had been purchased and the opportunity which the city of Corvallis offered for the establishment of a Ford agency were the occasions whereby the fiduciary relationship underwent another development. The defendant now became a borrower from the fund; in fact, before long he had borrowed all or virtually all of the money in the fund. He said his purpose was to increase the Captain's income. Be that as it may, his borrowings did increase the yield of the funds. But even though he was a borrower, and therefore the Pattersons' debtor, they still needed his services for the computation of interest, the making of necessary bookkeeping entries and the preparation of their income tax returns, and he proceeded to render the same services as before. The

mere fact that their son-in-law had become their debtor had not made the Pattersons capable of attending to these matters, nor had his new status as debtor made them less dependent upon him.

From the above, we conclude that the defendant had assumed the task of attending to the Pattersons' financial interests. His relationship to them was of a confidential nature; in short, he was their fiduciary. The very fact that a family relationship was intertwined with the business relationship invited the Pattersons to place still greater confidence in the defendant. The business transactions were not conducted in the office, but in the home, thus repelling the safeguards which business methods would otherwise have invoked.

Although the defendant would have the court believe that he performed his services as a mere volunteer, or in his son-in-law capacity, as a matter of fact, he was rewarded. Our reasons for saying that he was rewarded follow: He borrowed $70,500, according to his own admissions, and $75,500, according to the plaintiff's contentions, upon his unsecured promissory notes. It is true that his partner, Grout, signed with him some of the original notes, but that seemingly was not a credit factor. Again, the borrowings, after the original note of $22,000, bore only six per cent interest, a low return for an unsecured note. Further, instead of demanding payment when the notes matured, the Pattersons, in all instances except the original note of $22,000, permitted the defendant to substitute for matured notes renewal notes. In this way the defendant operated upon borrowed capital from 1920 to 1937 according to his contention, and from 1920 to today according to the plaintiff.

In the meantime, even when the depression was at its worst and when it drew in its wake the so-called banking holiday, he was not required to provide the Pattersons with security, not even with the limited security afforded by preferred stock. Thus, the financial agency had attractive features for the defendant. Among others, it permitted him to become established in a sizeable business; to speculate, as he himself conceded, in bank stock; to hold his profitable automobile paper; to purchase the half interest held in the business by his partner; and to rid himself of a mortgage upon his home. In the latter instance it appears that he made savings in the interest rate.

■ Had the relationship between the Pattersons and the defendant been nothing more than a creditor-debtor relationship, the defendant would have owed no duty to maintain records in behalf of the Pattersons; but an agent is subject to the duty to keep records and to render to his principal an account of his transactions. Restatement of the Law, Agency, section 328; Lawrence on Equity Jurisprudence, section 1138; 2 Am. Jur., Agency, page 226, section 286. We believe that the facts above reviewed necessarily warrant an inference that the defendant had taken upon himself the task of maintaining on behalf of the Pattersons accurate records, of computing for them the interest and of keeping them informed concerning the maturing of the notes. The following are some of our reasons: (1) When he signed the plaintiff's income tax returns he described himself as her agent; the following is one of his self-composed descriptions: "Agent thoroughly conversant with taxpayer's affairs." (2) His course in inducing the plaintiff to believe that his remittances were interest only cre-

ated in her a sense of security and caused her to forego the maintenance of records. (3) Her scribblings in her book, the defendant knew, were wholly inadequate as a record of the transactions and he knew that the Pattersons kept no other record. (4) According to his brief, "it must be clear that the plaintiff had no real knowledge of the amounts of these larger loans to defendant"; therefore, he knew that she could not, from her records, compute interest or know the maturity of the notes. (5) Neither the Captain nor the plaintiff was capable of making the entries and of computing the interest. (6) The defendant was the only one who computed the interest when it became payable, and his computations were never questioned. (7) He was the one who kept track of the maturing of the notes and whenever he asked that a matured note be returned and a renewal one accepted, his request was granted without question. (8) In order to facilitate the performance of his duties concerning the notes, he was given access to the safe deposit box where the notes were kept. (9) He frequently deposited remittances in the Pattersons' bank account and paid taxes or other obligations without consulting his principal, thus affording the Pattersons no opportunity to make entries essential to complete records.

As we have just said, it was incumbent upon the defendant to keep books concerning these transactions and to furnish the plaintiff with accountings. He, however, never rendered and never sought to render a true account. The very fact that in the spring of 1938 he talked to the plaintiff at great length concerning the sums he had borrowed and the remittances he had made indicates that he had a

consciousness of his duty to account. He claims that at that time he even resorted to arithmetical computations in order to back up his contentions that he had discharged the major part of his indebtedness, but it will be recalled that shortly prior to that time he had destroyed the last of his records. The defendant freely concedes that upon the occasion just mentioned he did not render a true accounting, but sought to avoid the issue and to conceal what he now claims to have been the facts. But that was the only occasion upon which he claims to have done anything in the nature of accounting.

The defendant argues that there can be no trust in the absence of trust property and that the maker of a promissory note can not hold the instrument as trustee for the payee. He cites authorities in support of both contentions. We believe that it is unnecessary for us to pass upon those propositions. We think that the defendant, as above stated, had become Captain Patterson's fiduciary and that upon the death of the Captain he became the plaintiff's fiduciary. His duties were to look after these notes and the Patterson's investments in them. He was expected to make the necessary entries, to substitute renewal notes for matured obligations, to make timely remittances, and perform the other financial services previously rendered by him before he became their debtor. If it can not be said that he had actual possession of the notes, he at least had unrestricted access to the strongbox where they reposed. Although an arrangement of the above kind with a stranger would have been foolish, the defendant was not a stranger to the Pattersons. His numerous letters to them, couched in affectionate terms, are testimonials

to his capacity for filial attachment. His integrity and intelligence had been demonstrated. And one of their daughters, a presumptive beneficiary of their ultimate bounty, was the defendant's wife, thus giving him a certain degree of self-interest to spur on his vigilance. The Pattersons had become convinced that their son-in-law was a man who could serve two masters—himself and them. Although mankind was taught two thousand years ago to pray "Lead us not into temptation," these two people felt satisfied that they could place all of their money into their son-in-law's keeping without being obliged to keep anything except the most meager of records.

The question, however, presents itself whether the defendant's status as debtor precluded his appointment as agent. According to 21 Restatement of the Law, Agency,

"Any person has capacity to hold a power to act on behalf of another."

In the comment which follows this section it is said:

"Any person may be appointed to act on account of another and to affect the relations of that other by his conduct. The power of a person to affect another who has consented to an action by him on the other's account is limited only by the agent's physical or mental ability to act."

Section 23 of the Restatement says:

"One whose interests are adverse to those of another may be authorized to act on behalf of the other; * * *"

In *Anderson v. Watson*, 141 Md. 217, 118 Atl. 569, the court recognized the above principle. Its deci-

sion is an illustration of its application. From section 177, Mechem on Agency, we quote:

"A person will not be permitted to take upon himself the character of an agent, where, on account of his relation to others, or on account of his own personal interest, he would be compelled to assume incompatible and inconsistent duties and obligations. An agent owes to his principal a loyal adherence to his interest, and it would be a fraud upon the principal and would contravene sound public policy, to permit a person, without the full knowledge and consent of his proposed principal, to enter into a relation involving such a duty, when his allegiance had already been pledged to one having adverse interests, or when his own personal interests would be antagonistic to those of his principal. With such full knowledge and consent, however, he may usually be agent."

It is, of course, clear that the Pattersons had complete knowledge of the defendant's adverse interest. The purpose of this suit is not to set aside nor to render void anything that the defendant did. To the contrary, this is a suit for an accounting and for a judgment. Therefore, its very nature is an affirmance of the defendant's vicarious relationship. Hence, the condition exacted by Professor Mechem that the principal know of the agent's adverse interest is present in this case.

■■ It follows from the above that the defendant's relationship to the Pattersons as their debtor did not deprive him of capacity of becoming and being their agent; nor did his status as debtor prevent him from taking upon himself the task of computing for them the interest upon his notes and maintaining for them accurate entries in account books concerning the indebtedness. We, therefore, conclude that he was their agent, charged with the duty of computing interest,

of making accurate entries and in other ways performing the duties demanded by his financial agency. To speak more accurately, he was their fiduciary.

We now come to the question as to whether or not the plaintiff is entitled to an accounting. It is manifest that the account between the parties is complicated, and the defendant himself concedes that "it must be clear that plaintiff had no real knowledge of the amounts of these larger loans to defendant." Complication of account is a frequent occasion for equitable relief: Pomeroy's Equity Jurisprudence (2d), section 2357. Although the defendant makes the admission just mentioned, he is the one who induced the plaintiff to part with notes from time to time as he delivered renewal instruments and, finally, to deliver to him the very last note which she possessed. Therefore, because of his admission, the fact that the existing notes are marked paid does not prevent her from gaining the relief now under consideration. Likewise, the admission just quoted further makes it manifest that the recitals in her last will which state that the defendant had discharged in full his obligation to her can not preclude her from maintaining this suit.

We quote again from Mechem on Agency. In section 1343, he states:

"It is well settled that the mere relation of principal and agent is not sufficient to authorize the principal to come into a court of equity for an accounting. For very many of the questions arising between them, the ordinary legal remedies are, as has been seen in the preceding section, entirely adequate; and where this is the case, resort can not ordinarily be had to equity. Whenever, however, the agency is one of a strictly fiduciary character, involving a question of confidence between the parties,

or, in many cases, where fraud is alleged or a discovery sought, the equitable jurisdiction will attach, even though some remedy at law might also have been found. So where the account is so complicated that it cannot be settled at law without great difficulty, a bill in equity may be maintained."

As already said, the defendant was the plaintiff's fiduciary, and the account is complicated.

From section 186, Pomeroy's Equity Jurisprudence (2d), we quote:

"The most important, comprehensive and multiform remedy of the concurrent jurisdiction which results in pecuniary recovery is that of accounting. The variety of its uses and possible applications is practically unlimited; it can be adapted to all circumstances and relations in which an account is necessary for the settlement of claims and liabilities, and for the doing full justice to the litigant parties. Among the most common instances in which this remedy is employed by courts of equity are the ascertaining and settlement of claims and liabilities between principal and agent * * *."

For an application of that principle, see *Hurlburt v. Morris,* 68 Or. 259, 135 P. 531.

The following is taken from section 417, Lawrence on Equity Jurisprudence:

"Every fiduciary who in any material particular represents another in the management of property, the transaction of business, or the handling of funds, may be required, by virtue of his superior information, to render an account."

From 3 C. J. S., Agency, page 47, section 163, we quote:

"In keeping with an agent's fiduciary relationship, it is an agent's duty and one which may always

be demanded of him to account to his principal for all property and funds belonging to his principal which came into his hands by virtue of his agency.''

From 1 Am. Jur., Accounts and Accounting, page 298, section 52, the following is taken:

''The jurisdiction of courts of equity to state and settle accounts, or to compel an accounting, is exercised also in a great variety of cases of original equity cognizance, such as those involving fiduciary and trust relationships * * *.''

See to like effect: Restatement of the Law, Agency, section 399; 2 Am. Jur. Agency, page 332, section 424; 1 C. J. S., Accounting, page 655, section 19; and 21 R. C. L., Principal and Agent, page 833, section 16.

■ From *Anderson v. Watson*, supra, we quote:

''The jurisdiction of a court of equity in matters of account extends to cases where the accounts are all on one side, as in this case, but where 'there are circumstances of great complication, or difficulties in the way of an adequate remedy at law,' and also to cases where a 'fiduciary relation exists between the parties and a duty rests upon the defendant to render an account' (Pomeroy Eq. Jur., sec. 1421; Miller's Equity, p. 823) and the necessity for a discovery may sometimes furnish a ground for equity jurisdiction (1 C. J. 617) * * *

''A 'fiduciary' or 'confidential' relation, when used in the same connection, exists 'in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence. The rule embraces both technical fiduciary relations, and those informal relations which exist wherever one man trusts in and relies on another; the origin of the confidence reposed is immaterial' * * *.

"Nor can there be any real question that there was a fiduciary and confidential relation between the parties to this proceeding. The coal which measured the compensation to be paid to the men who mined it was weighed by the company on its own scales and by its own agents, out of the presence of the miners, who were by the necessities of the case precluded from witnessing the operation of weighing, and who were as a practical matter obliged to rely on the good faith of the company. Under such circumstances, the miners naturally and necessarily trusted and relied upon the company's good faith, and the company assumed the duty of dealing fairly with them. For these reasons, in our opinion, the complainants are entitled to the accounting prayed for in their bill."

For further applications of the equity principles under consideration, see *Dillman v. Hastings,* 144 U. S. 136, 36 L. Ed. 378, 12 S. Ct. 662; *National Cattle Loan Co. v. Ward,* 113. Tex. 312, 255 S. W. 160; *Barnes v. Barnes,* 282 Ill. 593, 118 N. E. 1004, 4 A. L. R. 4; *Warren v. Holbrook,* 95 Mich. 185, 54 N. W. 712, 35 Am. St. Rep. 554. From the latter decision, we quote the following:

"It is first contended that complainant's remedy at law is adequate and complete, and that, therefore, this bill can not be maintained. Complainant might have maintained an action at law, and either attached or garnished the fund in the hands of Sweet. It requires no citation of authorities, however, to show that courts of equity have in many cases concurrent jurisdiction with courts of law. The general rule is that courts of equity have jurisdiction to compel an accounting where fiduciary relations exist, or fraud is charged: Story's Equity Jurisprudence, sec. 459; Pomeroy's Equity Jurisprudence, sec. 1421. Defendant Holbrook occupied a fiduciary relation to his employer. It was his duty to keep a true and accurate account of all the moneys received, and to pay them over or

account for them. If he failed to do this, the funds retained by him became in his hands trust funds belonging to complainant. He is charged with a breach of his trust, which is clearly shown. Its extent is peculiarly within his knowledge. In such case choice of remedies is with the party aggrieved, and he may proceed in equity for an accounting, and pursue the fund: Darrah v. Boyce, 62 Mich. 480; Wyckoff v. Victor Sewing Machine Co., 43 Mich. 309; Pierce v. Holzer, 65 Mich. 264; Clarke v. Pierce, 52 Mich. 157."

■ We are satisfied that the defendant dealt with the plaintiff, not as a mere debtor but as a fiduciary. The accounts between them are extensive and complicated. The plaintiff, in our opinion, is entitled to an accounting. She is entitled to maintain this cause as a suit in equity for the purpose of obtaining an accounting and a judgment for whatever sum, if any, the accounting may show to be the defendant's indebtedness to the plaintiff. That being true, the decree entered below was in error, and the cause is remanded to the circuit court with instructions to proceed in harmony with the above-mentioned principles.

KELLY, C. J., and BELT, BAILEY, LUSK and RAND, JJ., concur.