# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF ILLINOIS.

(No. 15649.—Decree affirmed.)

LINNIE F. HIGGINS, Appellant, *vs.* THE CHICAGO TITLE AND TRUST COMPANY *et al.* Appellees.

*Opinion filed April 14, 1924.*

1. FIDUCIARY RELATIONS—*relation of broker and client is not in itself fiduciary.* The relation of broker and client is not of itself a fiduciary relation in regard to dealings outside that relation, but actual fiduciary relation may be shown when the question arises.

2. SAME—*general rule as to when fiduciary relation exists.* A fiduciary relation is not limited to cases of trustee and *cestui que trust,* guardian and ward, attorney and client, or other recognized legal relations, but it exists in all cases in which influence has been acquired and abused and in which confidence has been reposed and betrayed.

3. SAME—*origin of a fiduciary relation is not material.* The origin of the confidence required to render a relation fiduciary is immaterial, and if the confidence in fact exists, is reposed by one party and accepted by the other, the relation is fiduciary, whether it be moral, social, domestic or merely personal, and equity will regard dealings between the parties according to the rules which apply to such relation.

4. SAME—*what does not show fiduciary relation between broker and client.* The fact that a dealer in grain authorized his brokers

to pay bills for him and advance him money while he had a credit balance on the books of the brokerage firm establishes only the relation of debtor and creditor and does not create a fiduciary relation where no special confidence is reposed on either side, the business being so handled merely for convenience and accommodation.

5. Deeds—*when notes given up for deed are presumed to have been made for valid consideration.* Where a dealer in grain gives a deed to a trust company for the benefit of his brokers, who surrender the grantor's notes as consideration for the deed, it will be presumed, in the absence of evidence to the contrary, that the notes were given upon a valid consideration and not in settlement of gambling transactions.

6. Same—*when letter as to execution of deed is not competent in a suit to set deed aside.* In a suit to set aside a deed on grounds of fraud and undue influence, a letter written by the attorneys of the beneficiaries of the deed to one of said beneficiaries reporting to him the execution of the deed is not admissible in evidence, but its admission is not prejudicial where the facts stated in it are shown by other evidence.

7. Same—*when witness cannot testify as to grantor's capacity to transact business.* In a suit to set aside a deed on the ground of the mental incompetency of the grantor, a physician should not be permitted to testify as to whether or not, in his opinion, the grantor was able to transact business during the month in which the deed was executed, as that is an ultimate question for the court or jury, but he may give his opinion as to whether the grantor was of sound or unsound mind.

8. Bills and notes—*promissory note imports consideration— burden of proof.* A promissory note imports a consideration and no proof thereof is necessary, and the burden is upon the maker alleging no consideration to prove his allegation.

9. Evidence—*when a grantor seeking to set aside deed cannot testify against representative of a deceased partner.* A grantor seeking, on the ground of fraud, to set aside her deed given to a trust company for the benefit of a partnership is not competent to testify in her own behalf as to transactions ocurring in the lifetime of a partner who died during the pendency of the suit and whose representatives are substituted as defendants, as such representatives have an equitable interest in the property conveyed and in equity are necessary parties to the suit affecting the title of the partnership.

10. Partnership—*representatives of deceased partner are necessary parties to suits in equity.* While the surviving partner has the legal title and may maintain and defend suits at law in regard to partnership property, in equity he is a trustee and is bound to

account to representatives of the deceased partner, and under the general rule of equity pleading that all persons interested should be made parties, such representatives should be made parties to all suits in equity involving assets of the partnership.

Appeal from the Circuit Court of Cook county; the Hon. Hugo M. Friend, Judge, presiding.

Bulkley, More & Tallmadge, for appellant.

Bartlett & Tyrrell, for appellee the Chicago Title and Trust Company.

Winston, Strawn & Shaw, (John C. Slade, and Clay Judson, of counsel,) for other appellees.

Mr. Justice Dunn delivered the opinion of the court:

Linnie F. Higgins filed her bill in the circuit court of Cook county to set aside a deed executed by herself and her husband to the Chicago Title and Trust Company, and has appealed from a decree dismissing her bill on a hearing.

The grounds upon which it is claimed the relief prayed for should have been granted are the physical and mental incompetency of the complainant's husband as well as of herself, the intimate and confidential fiduciary relations between Jackson Bros. & Co., the beneficiaries of the conveyance to the Chicago Title and Trust Company, and the complainant's husband; fraud because of undue advantage taken by Arthur S. Jackson of his intimate confidential relations with the complainant's husband and the resulting influence over him, and of Jackson's knowledge of the weakened condition of mind and body of complainant's husband and of the relation existing between him and the complainant; the illegality and invalidity of the consideration for the deed, being two notes of the aggregate amount of $40,000, claimed to have been given on account of gambling transactions. It is claimed, also, that error occurred in the admission and rejection of evidence.

The real estate conveyed by the deed was lots 12 and 13 and the east fifty feet of lots 16 and 17, in block 11, in Cochran's Second addition to Edgewater, and was situated on Kenmore avenue, in the city of Chicago. The complainant had owned the lots for a number of years and occupied them with her husband, Edward M. Higgins, as their home. He had been in the grain business for thirty years and had been vice-president of the Armour Grain Company, a large corporation, and was a member of the Board of Trade until his death. His connection with the Armour Grain Company ceased, and he afterward traded individually on the Board of Trade. For several years before his death, which occurred on February 15, 1918, he bought and sold extensively through the commission firm of Jackson Bros. & Co., consisting of Arthur S. and Howard B. Jackson. On November 11, 1916, Higgins gave to Arthur S. Jackson a note for $30,000, and on May 16, 1917, one for $10,000, each due a year from date, signed by both Higgins and his wife, payable to their order and indorsed by them. They were secured by mortgages which had not been recorded, and were held by Arthur S. Jackson until January 5, 1918.

In 1913 Higgins had an acute attack of Bright's disease, lasting six weeks, which affected him to such an extent that he never fully recovered, and thereafter he had relapses lasting several weeks at a time, and suffered from uremic poisoning, and during these times his mind was not so quick as usual nor his memory so good. His blood pressure was high, and in April, 1917, he had acute bronchitis, and in May, dropsy. His physician told him he was not fit for business and advised him to give it up. He grew worse, and in November became much worse, was delirious, and his physicians thought it necessary to bleed him, and did take 500 cubic centimeters of blood from him. Afterward he got up and against his doctor's orders went out during the months of December and January. On February 5, 1918, he was again delirious, he was bled again

on the ninth and tenth, he grew worse, and died on February 15. Dr. Bachelle testified that in November, 1917, and February, 1918, at the time when Higgins was bled, he failed to recognize Dr. Steffin, who was associated with Bachelle, but at those times Higgins was unconscious. This witness also testified that he had known Higgins many years and knew his normal mental state; that during the winter of 1917 and 1918 he was not in a normal state mentally; that he was irresponsible, not in a state to decide for himself or in a mental condition to transact business and should not have been allowed to go out. By "irresponsible" the doctor said he meant deranged mentally, but he did not give any instances of mental incompetency except the inability to recognize Dr. Steffin, when Higgins was unconscious. Dr. Steffin also expressed an opinion of the incompetency of Higgins from observation of him on the two occasions when he was bled and was unable to recognize Dr. Steffin. Mrs. Conlin and Mrs. Van Thompson were friends of Mr. and Mrs. Higgins of long standing and were frequent visitors at their house. They testified as to the condition of Higgins' health and the course of his sickness, to certain peculiarities and eccentricities in his conduct and changes in his manner, and expressed rather vaguely their opinion that he was unable to transact business, but did not express an opinion that he was of unsound mind or state facts upon which such an opinion could properly rest. On the other hand, there was the testimony of several witnesses, acquaintances of Higgins who had known him for years and associated with him at the Board of Trade, who saw and conversed with him in January before his death and observed no indication of any lack of mental capacity.

The deed was executed on January 5, 1918, and the circumstances attending its execution were related by the complainant and by Duane T. McNabb, who prepared it and as a notary public took the acknowledgment of the grantors. The complainant testified that on that day she went with

her husband to the offices of the attorneys of Jackson Bros. & Co., in the First National Bank building, for the purpose of signing the deed; that she went with her husband into a room where several men were, and he sat down at a desk and had some conversation which she did not hear; that her husband then signed the deed and asked her to sign it, and she did so. She had never been to those offices before, had never talked to Jackson Bros. & Co. or anyone else about signing the deed, but went there to sign it and signed it without question solely because her husband asked her to. She said that he never said a word to her as to why he wanted her to sign the deed and she never asked him a word; that she never mentioned it afterward and he never did.

McNabb testified that he had prepared the deed and was present when it was executed and at the conference preceding its execution. F. C. Hack, of the firm of attorneys, was present and had the notes and mortgages given to Arthur S. Jackson. McNabb, Hack and Mr. and Mrs. Higgins were the only persons present. McNabb said to Mr. and Mrs. Higgins that it was his understanding the notes and mortgages were to be canceled and returned to them, and asked if that was correct. Higgins said it was and Mrs. Higgins nodded her head. Hack also explained to them that inasmuch as the mortgages had not been recorded he wanted to be sure that they understood the nature of the transaction, and that the title to the Chicago Title and Trust Company was for Jackson's benefit and not in the nature of another mortgage. Higgins said he so understood it and it was immaterial to whom they made the deed. Mrs. Higgins said she understood it the same way. The notes and mortgages were then marked "paid and canceled" and delivered to Higgins. McNabb saw both the complainant and her husband sign the deed and then took their acknowledgment. He asked each of them if they executed the instrument as their free and voluntary act, and both said they did.

The complainant was in constant attendance upon her husband, and the draft upon her physical and mental resources, particularly after his serious sickness in November, was continuous and severe.   She was worried about his condition and her nerves were over-wrought but there was no evidence of mental unsoundness.   Her mind was clear enough, so far as appears from the evidence, but her whole thought was devoted to the care of her husband, whose condition of health was critical but who still insisted on going out and attending to business.   She was not giving any thought to business and did not concern herself with it, but she consented to go down-town to sign the deed when he asked her to, and signed it without objection or question and without any reason to do so except that he requested it.   The evidence does not justify the conclusion that either the complainant or her husband did not have the mental capacity to execute the deed or did not know and understand the effect of what they were doing.   It is apparent that Higgins' health was in a serious condition for many months before his death and that he made no substantial improvement after November, 1917.   It was very imprudent for him to go out in December and January afterward, contrary to his physician's advice, and engage in business, but he did so, and there is no evidence that the business was not prudently transacted or that he did not thoroughly comprehend it.   The imprudence was because of a lack of physical capacity and not from any deficiency of mental understanding.

There was also a failure to show the existence of a fiduciary relation between Jackson Bros. & Co. and Higgins or Mrs. Higgins.   Jackson Bros. & Co. were brokers for Higgins.   He was, and had been for many years, a member of the Board of Trade.   He could go into the pit personally and make trades, but he was not a clearing house member and could not clear his trades through the Board of Trade clearing house.   He was obliged to deal through a broker

312—2

who was a clearing house member. His numerous transactions were handled through Jackson Bros. & Co. as brokers, and they, under the rules of the Board of Trade, became principals in the contracts made for him. The relation of broker and client is not of itself a fiduciary relation in regard to any dealings outside of that relation. An actual fiduciary relation may be shown in respect to other matters but it does not arise because of the relation of broker and client. A fiduciary relation, however, is not limited to cases of trustee and *cestui que trust,* guardian and ward, attorney and client, or other recognized legal relations, but. it exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence is immaterial. It may be moral, social, domestic, or merely personal. If the confidence in fact exists, is reposed by the one party and accepted by the other, the relation is fiduciary, and equity will regard dealings between the parties according to the rules which apply to such relation.

It is argued for the appellant that the account of Higgins kept on the books of Jackson Bros. & Co. establishes the fact that they were his bankers, brokers and confidential agents. The fact that they were his brokers needs no proof, for it is admitted. The account running from July 27, 1916, to February 15, 1918, contains 469 items, 194 of which are trading debits and 275 the appellant's counsel call personal items. The debits, other than trading during the last eighteen months of Higgins' life, are summarized as currency, $5248.25, checks, $15,433.12, London exchange, $124.74, Paris exchange, $17.25, miscellaneous cash book items, $10,841.11. The total is $31,664.47. They included store bills, life insurance premiums, laundry bills, gas bills, a contract for building an addition to the house, and other bills. In regard to the payment of these amounts Arthur S. Jackson testified that Higgins was in the habit of going to the cashier and getting $25 or $50 whenever he needed

it, and the firm paid bills for him only on his instructions. The only relation established by this evidence is that of debtor and creditor. Higgins' credit was good, he had a credit balance on Jackson Bros. & Co.'s books, he believed in their honesty and integrity as they did in his, and on his request they paid bills for him or advanced him money. There was no special confidence reposed in these transactions on either side. It was an ordinary method of dealing with a great many customers in the payment of bills according to the testimony of Arthur S. Jackson, which is not contradicted, and the firm charged nothing for it, being purely an accommodation.

The bill charged that Higgins had placed $100,000 with the Merchants Loan and Trust Company in trust for his wife but had retained the right to direct in what securities the money should be invested; that in 1916 Jackson Bros. & Co. received from him two checks of the Merchants Loan and Trust Company for $50,000 each; that they knew of the existence of the trust fund, and, by some inducement unknown to the complainant, induced Higgins to direct the investment of the money in two notes of Higgins for $50,000 each; that this was done and checks for these amounts were given to Higgins, which he delivered to Jackson Bros. & Co. There is no evidence in the record of any effort to influence Higgins to turn this fund over to Jackson Bros. & Co. or to make the deed to the Chicago Title and Trust Company. The deed was made to the grantee as trustee, under the provisions of a trust agreement of the same date known as trust No. 7388. The trust agreement was between the Chicago Title and Trust Company and Arthur S. Jackson. Neither Higgins nor his wife was a party to it. McNabb testified that it was explained to the complainant and her husband that the title was taken by the title and trust company for the benefit of Jackson; that he wanted it that way, and it was not in the nature of another mortgage but the title and trust company would hold

it for Arthur Jackson.    Higgins said that he understood it and it was immaterial to whom they made the deed.

On the question of the fiduciary character of the relation between Jackson Bros. & Co. and Higgins, evidence was given of certain statements of Howard B. Jackson, a partner in the firm of Jackson Bros. & Co., who died after this suit was brought.    Mrs. Van Thompson testified that Jackson was in charge of Higgins' funeral and that after the funeral she had a conversation with him, in which she asked him if he thought Mrs. Higgins would be able to keep up the home, and he said:    "No; I don't think she will be able to keep up the home in its present condition, but as her agent, and as our firm has handled and has done business for Mr. Higgins and are continuing to do it for her and as her agents, we will sell the property for her and invest the proceeds in such a manner and in such securities as will bring her a good income for the remainder of her life and take care of her very nicely indeed."    Mrs. Conlin was present at this conversation, and testified:    "I saw Mr. Howard Jackson, and I heard him say to Mrs. Van Thompson:    'You know we are Mrs. Higgins' agents and we are going to take care of her, and it won't be possible for her to keep up the home and keep up the expenses of the home, so we are going to dispose of the home and invest it in such a manner as to give her an income and take care of her comfortably as long as she lives.' "

Dr. Vaughan, who treated Mrs. Higgins in 1918, after her husband's death, testified that her condition seemed to be dependent largely on financial worry.    She did not know what her situation was.    She told him that Jackson would probably know but she could not get any satisfactory information.    Upon his suggestion, and with her consent, Dr. Vaughan called upon Jackson at his office.    He testified further:    "I explained the situation to him, and he said he would very gladly tell me all there was to be told, and said that the financial condition, compared with what

her former mode of life had been, was, in a sense, very serious. He said: 'If you or somebody else could persuade Mrs. Higgins to dispose of her present home and live in a more modest way there would be sufficient income to take care of her as long as she ordinarily would live.' I said: 'May I go back and tell her that she has no worry financially, and that she will be properly cared for, and can be as long as she lives, with what resources there are?' and he said: 'You may, and also tell her from me that my friendship for her husband was such that I would certainly do the best for her that anybody can possibly do.' "

In the spring of 1920, Jackson Bros. & Co. having advertised for sale the Higgins home, Dr. L. C. Ziegler called there with a view to buying it, and afterwards, as he testified, Howard B. Jackson called upon him and said: "This is Mr. Howard Jackson, of Jackson Bros. & Co. We are the agents and representatives of Mrs. Higgins. Mrs. Higgins informs us that you called at her home to investigate the home and that you inspected the home with reference to purchasing the same. She also informed us that you expressed a desire to deal with her directly, as principal and owner of the property. Now, any negotiations that you might enter into with Mrs. Higgins would be frowned upon by her relatives and friends, because they have long been cognizant of the fact that both Mr. and Mrs. Higgins were absolutely incompetent and incapable of transacting any business of any character whatever." The doctor testified to the further statement that the deed had been given simply and solely as a business convenience. As Jackson had for several years acted as Higgins' agent he advised Higgins to do this, so that in case it became necessary to make this turn he could do it, "but the property was, and always had been, the property of Mrs. Higgins." Eleanor Barnett, who was then employed by Dr. Ziegler, was present and heard the conversation. Her version was that Jackson said the property now, and always had, belonged

to Mrs. Higgins, but on the advice of Jackson Mr. and
Mrs. Higgins had made the deed as a business convenience
in case it became necessary to turn the property in any way;
that Jackson Bros. & Co. had been the agents of Higgins for
several years; that Higgins was not really mentally capable,
and Jackson had taken care of all of his business, making
out his checks and everything of that sort. "I didn't take
it that at the time this conveyance was made he didn't think
Mrs. Higgins was mentally competent, but that it was more
because she had no ideas of business ways or methods, and
it was simply that she followed the advice given her."

These statements cannot be regarded as indicating that
the relation of Jackson Bros. & Co. to Higgins in his life-
time was a fiduciary relation. The language in which they
were expressed may not have been accurately used, it may
not have been correctly understood, and it may not have
been precisely repeated. In the case of the first three
witnesses, the time and circumstances would indicate the
friendly purpose of the speaker rather than an exact state-
ment. It seems rather singular that the statements testified
to by the doctor should have been made under the circum-
stances, but in any event they do not of themselves show
a fiduciary relation or fraud. If they were actually made as
testified to, they could do no more than excite a suspicion
that some detail of the whole transaction has not been re-
vealed. They certainly do not constitute evidence of the
clear, certain and definite character required to set aside
a deed.

The evidence does not sustain the appellant's claim of
fraud. The physical weakness of the complainant's hus-
band and its effect on his mental ability, the anxiety and
distress of the complainant, her inexperience in business and
her reliance upon her husband, the testimony of their friends
and physicians as to their physical and mental weakness,
must all be taken into consideration, but after these are all
given their due weight there remains no serious doubt that

Higgins thoroughly understood the transaction and voluntarily and with full understanding executed the deed, and that Mrs. Higgins, relying upon her husband's knowledge and judgment with full confidence, also willingly executed the deed with full knowledge of its character and effect. She testified: "Certainly I understood the paper I signed in the office was a deed. My husband told me that." She had had no business experience but was always in the habit of signing anything he asked her to sign. The instrument was explained to her, she acted upon the only counsel she ever sought, she was not imposed upon, deceived or misled, and she cannot, under these circumstances, be relieved from the consequences of her act.

A large part of the appellant's brief is devoted to a consideration of the character of the dealings between Higgins and Jackson Bros. & Co. It is claimed they consisted entirely of gambling transactions, out of which no liability arose; that they resulted in losses of large sums by Higgins; that the notes which constituted the consideration for the deed in question were given in settlement of such losses, and were therefore void and constituted no consideration for the conveyance. The consideration of the deed was two notes, one for $30,000, dated November 11, 1916, the other for $10,000, dated May 16, 1917, each secured by a mortgage on the premises in question. The evidence does not show that losses incurred in connection with the transactions of Higgins with Jackson Bros. & Co. formed the consideration of these notes or any part of the consideration. The circumstances under which they were given are not disclosed. All that appears in the record is that Arthur S. Jackson held them on January 5, 1918, and that they were canceled and surrendered upon the execution of the deed. In Higgins' account on the books of Jackson Bros. & Co. is a credit of $30,000 by a note under the date of December 31, 1916, but there is no identification of this credit with the note of November 11. There is no credit

of $10,000 in the account and no intimation in the record as to the origin of the $10,000 note. Promissory notes import a consideration and no proof of consideration is necessary. The burden of proof is upon the maker alleging no consideration. The record does not disclose the consideration of these notes, but the presumption is that they were given upon a valid consideration, and the cancellation and surrender of them were a valid consideration for the deed.

Mrs. Higgins was offered as a witness to testify generally in the case but on objection by the defendants was not permitted to testify as to facts occurring in the lifetime of Howard B. Jackson, who had died during the pendency of the suit and whose executors had been substituted as defendants and were defending in their representative capacity. She was incompetent as to such facts under section 2 of the act in regard to evidence and depositions. The suit was brought against Howard B. Jackson and Arthur S. Jackson, co-partners doing business under the name and style of Jackson Bros. & Co., and charges of fraud and improper conduct in procuring the deed are made against that firm. The answer of the partners alleged that the complainant and her husband were indebted to them upon the promissory notes which constituted the consideration for the conveyance, and that the conveyance was made to the Chicago Title and Trust Company as trustee for their benefit, in satisfaction and payment of the notes. Upon the suggestion of the death of Howard B. Jackson and the substitution of his executors, it was ordered that the answer of Jackson Bros. & Co. to the amended bill should stand as the answers of his executors and trustee under his will. It is now claimed by the appellant that the estate of the deceased partner, Howard B. Jackson, has no interest in the partnership property until after the claims and demands of creditors are satisfied; that therefore the estate will not be increased or diminished by the decree and his representatives are not necessary parties to the suit.

At common law the surviving partner succeeds to the title to the partnership property and may maintain and defend in his own name suits involving the partnership interest, and the representatives of the deceased partner are not proper parties to such suit. While the surviving partner has the legal title and may maintain and defend suits at law in regard to property, in equity he is a trustee and is bound to account to the representatives of the deceased partner, and under the general rule of equity pleading that all persons interested in the controversy which is the subject of the action should be made parties, the representatives of the deceased partner should be made parties to all suits in equity involving the assets of the partnership. This rule in regard to parties in equity is stated in *Bradley* v. *Gilbert,* 155 Ill. 154, and *Rodisch* v. *Moore,* 253 id. 296. Under paragraph 1 of section 38 of the Uniform Partnership act, (Laws of 1917, p. 634,) upon a dissolution of a partnership each partner, as against his co-partners and all persons claiming through them in respect to their interest in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities and the surplus applied to pay in cash the net amount owing to the respective partners. Clearly the executors of Howard B. Jackson have an equitable interest in the property conveyed by this deed and were necessary parties to a suit in equity affecting the title of the partnership. The complainant was therefore an incompetent witness in her own behalf as to matters occurring during the lifetime of Howard B. Jackson.

The court admitted, over the complainant's objection, a letter written by the attorneys of Jackson Bros. & Co. to Arthur S. Jackson on the day the deed was executed, reporting to him what had been done. The letter was incompetent, but all the facts stated in it were shown by other evidence. The cause was heard by the court and the letter did the complainant no harm.

It is also objected that the testimony of McNabb, the lawyer who prepared the deed and as notary public took the acknowledgment of it, who was an employee of the attorneys of Jackson Bros. & Co., should be given no weight, and it is said that he was under the influence and domination of his employers. No objection was made to his testifying. All the evidence in the cause was heard by the chancellor in open court. The complainant and McNabb were the only witnesses who testified as to what occurred at the execution of the deed, and the court, from seeing and hearing them, was better qualified to judge as to the weight which should be given their testimony than a reviewing court, which sees only the record of the words used.

Complaint is made of the action of the court in not permitting Dr. Bachelle to give his opinion, on direct examination, of the competency and ability of Mr. and Mrs. Higgins to transact business in January, 1918. He did testify that in his opinion Higgins was not mentally in a condition to transact business between November, 1917, and his death. His statement at one time in his examination that Higgins was not entirely normal was stricken out as being too general, but later he gave the same testimony without objection. He stated his conclusion that Higgins was not able to be running around by himself or going out and doing business, and this was stricken out, but the facts which he detailed on which he based his conclusion remained. He was not permitted to give his opinion as to the ability of Mr. and Mrs. Higgins to transact business in the month of January. This was the ultimate question for the court to determine and not for the witness to decide, though he might have testified as to whether in his opinion Mr. and Mrs. Higgins were of sound or unsound mind. The court did not err in excluding this testimony.

The decree will be affirmed.

*Decree affirmed.*