**TENNESSEE–LOUISIANA OIL COMPANY, Petitioner,**

v.

**Dixon CAIN, Respondent.**

**No. A–10449.**

Supreme Court of Texas.

Jan. 26, 1966.

Rehearing Denied March 9, 1966.

Baker, Botts, Shepherd & Coates, Finis E. Cowan and William C. Harvin with above firm, Houston, for petitioner.

Vinson, Elkins, Weems & Searls, Leroy Jeffers with above firm, Houston, for respondent.

SMITH, Justice.

Tennessee-Louisiana Oil Company, hereinafter designated as plaintiff, filed this suit against Dixon Cain, hereinafter referred to as defendant, for breach of fiduciary duty. Trial was to a jury, and judgment was entered on the verdict in favor of plaintiff against the defendant for $57,750.00. The Court of Civil Appeals reversed and remanded the cause to the trial court for a new trial. 382 S.W.2d 794. We affirm the judgment of the Court of Civil Appeals.

Plaintiff alleges that on January 14, 1960, plaintiff and Tennessee Gas Transmission Company, on the one hand, and Fifteen Oil

Company, of which Dixon Cain was President, on the other hand, entered into a "Plan of Reorganization" whereby Fifteen Oil Company agreed to transfer substantially all of its assets to plaintiff in exchange for 477,092 shares of .$5.00 par value common stock of the Tennessee Gas Transmission Company. The Plan of Reorganization was amended on March 24, 1960, and finally consummated, and all transfers were made in accordance with the Plan on May 15, 1960.

Plaintiff's position throughout has been that the defendant, in consideration of the sum of $57,500.00 paid with its consent by Fifteen Oil Company, agreed that he would not be retained in the employ of plaintiff, but did agree to remain available in a retained advisory capacity. The written agreement executed on May 2, 1962, reads as follows:

"With reference to the Plan of Reorganization entered into on January 14, 1960 and amended on March 24, 1960, between Fifteen Oil Company, Tennessee Gas Transmission Company and you, each of the undersigned (1) does hereby acknowledge receipt of payment by Fifteen Oil Company, as severance pay, of an amount equal to one and one-half (1½) times his current annual compensation; and (ii) does hereby agree that he will be available to you in a retained advisory capacity for a period of six (6) months from and after May 2, 1960, in order that there will be no abrupt change in management and in order that you may avail yourself of his special knowledge concerning the affairs and properties of Fifteen Oil Company."

The plaintiff contends that by virtue of the terms of this agreement, the defendant, during the six (6) month period provided in the agreement, was, in effect, the agent of plaintiff and "had as to the Tennessee Louisiana Oil Company the undivided duty of fidelity and loyalty which an agent owes to his principal and which an employee owes to his employer, and it was in order to attempt to insure that Mr. Cain would not use his special knowledge of the properties and affairs of Fifteen in violation of and contrary to the interests of the former Fifteen Company stockholders and the Tennessee-Louisiana Oil Company that the Tennessee-Louisiana Oil Company was willing to consent to the payment of this very large sum of money [1] to Dixon H. Cain."

The plaintiff further contends specifically that the defendant breached the duty of a fiduciary when he wrote a letter on October

1. The plaintiff's consent to the payment of the sum of $57,500.00 as severance pay to the defendant is embodied in Article 15.1 of the Plan of Reorganization, reading as follows:

"15.1 Fifteen has indicated to Company that it will not be requested to offer employment to Messrs. Dixon H. Cain, John T. Lochridge, and Harry H. Hudson in the event that the exchange contemplated hereby is consummated, and that in the event of such consummation, these gentlemen will resign their respective positions with Fifteen immediately prior to the effectuation of the exchange and will receive from Fifteen as severance pay, one and one-half times their current annual compensation, Tennessee consents to the payment of such severance payments to Messrs. Cain, Lochridge and Hudson from the cash on hand of Fifteen at Closing Date. In consideration of such severance payments to Messrs. Cain, Lochridge and Hudson, Fifteen obligates itself to obtain from them, letter of agreement directed to Company to be delivered to Company at Closing Date that they and each of them, will be available to Company in a retained advisory capacity for a period of six (6) months from and after the date of the exchange contemplated hereby in order that there will be no abrupt change in management and in order that Company may avail itself of their special knowledge concerning the affairs and properties of Fifteen."

The severance pay was authorized by the Board of Directors of Fifteen Oil Company, and actually paid by Fifteen. The plaintiff paid $57,500.00 less for the properties of Fifteen.

19, 1960, to plaintiff and the Phillips Petroleum Company [2] demanding further development of the Martinez Lease, one of the properties included in the Plan of Reorganization and conveyed to plaintiff by Fifteen Oil Company. The letter was written by the defendant, in behalf of his father, J. W. Cain, an owner for many years of 25% of the minerals in and under the Martinez property. Copies of the letter were sent to other lessors interested in the Martinez Lease. In substance this letter reminded the plaintiff that a well had been drilled on the Callery Unit off-setting the Martinez Lease and that, under the terms of the Martinez Lease, the plaintiff was obligated to develop or reassign the lease.

It is the action of the defendant in writing this letter which the plaintiff contends violated the terms of the letter agreement of May 2, 1960, wherein the defendant agreed to hold himself available to the plaintiff "in a retained advisory capacity for a period of six (6) months from and after May 2, 1960, *in order that there will be no abrupt change in management*" and in order that the plaintiff *"may avail yourself [itself] of his special knowledge concerning the affairs and properties of Fifteen Oil Company."* [Emphasis added.] The plaintiff makes the additional contention that the writing of this letter violated and was contrary to the representations and warranties contained in the "Plan of Reorganization" and a "Certificate" executed by Fifteen Oil Company on May 2, 1960. Although both instruments were executed by Fifteen Oil Company and the representations and warranties contained therein were those of Fifteen Oil Company, plaintiff alleged that the warranties contained in the "Plan of Reorganization" were the representations of Dixon H. Cain, the defendant.

The defendant Cain has taken the position from the inception of this case that the plaintiff's acquisition of the Fifteen Company was after long drawn out arm's length negotiations; that the record establishes as a matter of law that there was no fiduciary relationship between the plaintiff and defendant and that he breached no fiduciary obligation owing to plaintiff for the reason that under the undisputed evidence the defendant's only duty to plaintiff was the contractual duty to remain available in an advisory capacity and that neither the writing of the letter nor any other act on his part constituted a breach of his duty to the plaintiff.

The record clearly reflects an arm's length transaction. The evidence is undisputed that Dixon Cain was approached by Mr. Smallwood, a Dallas investment banker, in June, 1958, with an invitation to have dinner with two officers, Graham and Symonds, of the Tennessee Gas Transmission Company. The invitation was accepted and at the meeting Cain was told by Symonds that "Tennessee wanted Fifteen's properties and * * * wanted me to work for them and would I present it to my Board of Directors. * * *" In July or August, 1958, Cain did present this proposition to Fifteen's Board, but it was turned down. Cain notified Graham by letter that their offer had been refused and asked Graham "if [Tennessee] was going to continue to be interested in [Fifteen] and continue to buy stock in [Fifteen]" in the face of the fact that Fifteen did not desire to sell to Tennessee. Graham assured him that they would not be interested in acquiring any other stock. However, Tennessee continued to acquire stock in Fifteen through Mr. Smallwood in Dallas so that, by July, 1959, Tennessee owned over 20% of Fifteen (263,000 shares). Tennessee, by its letter to Smallwood in February, 1957, urged Smallwood to continue purchasing Fifteen common stock and assured Smallwood against loss in the event Tennessee later decided not to purchase the stock. Thereafter, Cain and other officers of Fifteen proceeded to negotiate with Tennessee through Graham and others as to

2. Phillips was a joint lessee of the Martinez Lease.

the details of a sale of Fifteen to Tennessee, and the sale was consummated in May, 1960.

At the close of plaintiff's evidence the defendant presented to the court a motion for an instructed verdict. The motion urged the court to instruct the jury to return a verdict in favor of the defendant, or in the alternative, to withdraw the case from the jury and to render judgment in his favor on the ground that there was no evidence of a fiduciary relationship between the plaintiff and defendant, and further, "[b]ecause the evidence is without dispute that no part of the sum of $57,750 for which the plaintiff sues in this case came from the plaintiff to this defendant or that the giving of such sum to this defendant by Fifteen Oil Company cost the plaintiff in this case or its predecessors in interest any amount of money, and that by the giving of the same to this defendant Fifteen Oil Company and its Board of Directors discharged an obligation to this defendant which they in the exercise of their discretion as directors of said company felt this defendant to be entitled."

The plaintiff, at the close of all of the evidence moved for an instructed verdict on the ground that:

"[a]s a matter of law, by virtue of the terms of the Plan of Reorganization of Fifteen Oil Company (hereinafter "Fifteen") dated January 14, 1960 and the letter agreement of Tennessee and Dixon Cain dated May 2, 1960, Dixon Cain, for the period of six months following May 2, 1960, became an agent of, a consultant and adviser to Tennessee in order that there would be no abrupt change in management and in order that Tennessee might avail itself of his special knowledge of the business affairs and properties of Fifteen. Further, as a matter of law, by virtue of the relationship created thereby for such period of time, Dixon Cain owed Tennessee the fiduciary duty and loyalty which an agent owes the corporation."

Both motions were overruled and the court submitted seven special issues to the jury. Those issues and the answers thereto read as follows:

"SPECIAL ISSUE NO. 1: Do you find from * * * the evidence that by virtue of the Plan of Reorganization of Fifteen Oil Company and the Letter Agreement of May 2, 1960, between Dixon Cain and Tennessee Louisiana Oil Company, Dixon Cain agreed to act for Tennessee Louisiana Oil Company to the extent of remaining available in a retained advisory capacity for a period of six months from and after May 2, 1960, in order that there would be no abrupt change in management and in order that Tennessee might avail itself of his special knowledge concerning the affairs and properties of Fifteen Oil Company?

"Answer: *We do.*

"SPECIAL ISSUE NO. 2: Do you find from * * * the evidence that during the six month period in which he had agreed to be available to Tennessee-Louisiana Oil Company in a retained advisory capacity with respect to the properties of Fifteen Oil Company, Dixon H. Cain took action in connection with one of such properties which action was adverse to and against the interest of Tennessee-Louisiana Oil Company and in said property?

"Answer: *We do.*

"SPECIAL ISSUE NO. 3: What sum of money, if any, would fairly and reasonably compensate Tennessee-Louisiana Oil Company for the damages, if any, which resulted from such action on the part of Dixon H. Cain, if any you have found?

"Answer: *$60,000.00.*

"SPECIAL ISSUE NO. 4: From a preponderance of the evidence state the extent, if any, to which Dixon Cain benefited or profited from such action, if any you have found?

"Answer: *$45,000.00.*

"SPECIAL ISSUE NO. 5: Do you find from * * * the evidence that the sum of $57,750.00 was paid to defendant, Dixon H. Cain by Fifteen Oil Company?

"Answer: *We do.*

"SPECIAL ISSUE NO. 6: Do you find from * * * the evidence that the release of the Martinez lease was proximately caused by the failure of the employees of Tennessee Louisiana Oil Company to proceed with the decision made to obtain an extension of such lease and a farm-out agreement?

"Answer: *We do.*

"SPECIAL ISSUE NO. 7: Do you find from * * * the evidence that the release of the Martinez lease was proximately caused by the failure of the executives of Tennessee Louisiana Oil Company to make any decision with respect to obtaining an extension of the lease, a farm-out agreement, or the drilling of a test well?

"Answer: *We do not.*"

Plaintiff filed its motion for judgment based upon "the pleadings, the evidence, the findings of the jury to special issues numbers 1 through 4, individually and collectively, and the law applicable thereto." In its motion for judgment, the plaintiff contended that the answers to special issues 5 and 6 were immaterial to every "cause of action asserted herein, and such findings afford no basis for an entry of any judgment for the defendant, they are of no force and effect and should be disregarded."

Defendant's motion for judgment alleged as grounds therefor the following:

" * * *

"(1) By its answer to Special Issue No. 6 submitted by the Court to the jury, the jury found that the release of the lease in question was proximately caused by the failure of the employees of Tennessee-Louisiana Oil Company to proceed with the decision made to obtain an extension of such lease and a farmout agreement; such failure is in no way attributable to this defendant and the jury has not in response to any special issue found that any damages sustained by the plaintiff or the release of the lease in question was occasioned by any action of this defendant.

" * * *

"(3) In the alternative, this defendant moves the Court to set aside and hold for naught the answer of the jury to Special Issue No. 1, in answer to which the jury found that this defendant had by virtue of this plan of reorganization of Fifteen Oil Company and the Letter Agreement of May 2, 1960 between Dixon Cain and Tennessee-Louisiana Oil Company, agreed to act for Tennessee-Louisiana Oil Company because the same is entirely unsupported by the evidence, and upon setting aside such answer of the jury to enter judgment herein in accordance with this defendant's motion for instructed verdict filed at the close of the plaintiff's case.

"WHEREFORE, premises considered, this defendant prays the Court to enter judgment herein that Tennessee-Louisiana Oil Company have and take nothing of and from this defendant, or, in the alternative, that the Court set aside the finding of the jury in response to Special Issue No. 1 and thereafter render judgment herein in favor of this defendant and that plaintiff take nothing against him, together with such other and further relief, both general and special, at law and in equity, to which he may show himself justly entitled."

The Court granted plaintiff's motion and overruled that of the defendant. Thereupon, judgment was entered in favor of plaintiff "against the defendant, Dixon H. Cain, in the amount of Fifty-seven Thou-

sand Seven Hundred Fifty Dollars ($57,-750), with interest thereon at the legal rate from the date of entry of this judgment."

On appeal to the Court of Civil Appeals the defendant presented points of error, which if sustained, would have required the Court of Civil Appeals to reverse the judgment of the trial court and render judgment that the plaintiff recover nothing against the defendant. However, the Court of Civil Appeals of the Twelfth Supreme Judicial District of Texas, at Tyler, to which Court the cause was transferred by this Court upon the equalization of the dockets of the several Courts of Civil Appeals, reversed the judgment of the trial court and remanded the cause to that court for a new trial.

The defendant's three points in the Court of Civil Appeals attacked the judgment of the trial court upon the grounds that (1) the Court erred in submitting over timely and proper objection, issue No. 1, because such issue called upon the jury to determine issues of law rather than of fact, in that, it asked the jury to interpret the meaning of the documents mentioned in the special issue; (2) the only agreement between the defendant and the plaintiff was that the defendant was to remain in a retained advisory capacity, as stated in the letter agreement of May 2, 1960, and that there was no evidence that the defendant agreed to act for the plaintiff in any other capacity; and (3) "the Court erred in submitting to the jury, over timely and proper objection of the appellant, special issue No. 2, * * * to which the jury answered, 'we do,' because there is no evidence that appellant, Dixon H. Cain, took any position with respect to the property therein inquired about except to assert the position of his father for whom appellant acted as attorney in fact."

The facts in this case are undisputed. There is no dispute concerning the signing of the various instruments mentioned in the submitted issues. When the writ of error was granted, this Court was of the tentative view that the trial court entered a proper judgment in this case, and that the Court of Civil Appeals erred, as asserted by the plaintiff in its application for the writ, "in reversing the judgment of the trial court because the evidence established conclusively and as a matter of law that the written instruments governing the relationship between the parties created a duty of loyalty on the part of Cain. The submission of special issue No. 1 was thus immaterial and did not cause the rendition of an improper judgment."

The defendant, in this Court, presents a counter point stating that:

"[t]he record establishes as a matter of law that there was no fiduciary relationship between respondent and petitioner and that respondent breached no fiduciary obligation owing to petitioner because under the undisputed evidence respondent's only duty to petitioner was the contractual duty to remain available in an advisory capacity and respondent has in no way breached that duty. Therefore, petitioner cannot complain of the judgment of the Court of Civil Appeals because, if it had decided the issues here involved as a matter of law, it would have been compelled to reverse and render for the respondent."

▮▮▮ After a careful consideration of the record, including oral arguments and the briefs of the parties, we have concluded to sustain the defendant's contention. A fiduciary relationship existed between the parties with respect to any transaction where information or advice was imparted or requested under the terms of the letter agreement, but Cain was under no duty to refrain from acting adversely to Tennessee's interest in other and wholly unrelated matters. Admittedly, the defendant owed a duty to act within the framework of the agreement of May 2, 1960. We construe the retained advisory letter as having obligated the defendant to give the plaintiff information about Fifteen's former business

*if and when asked* by the plaintiff. The only evidence in the record that plaintiff requested advice is found in the testimony of the defendant. He testified that he was called on by some of the officials of the plaintiff for information in regard to Fifteen's exploration operations in the Dominican Republic. In response to the request, the defendant went to the office of Mr. Cowan and Mr. Harvin and told them what he knew about the controversy between Fifteen and "some of the other parties to the operation." It appears that this matter was in litigation. There is no contention that the defendant failed to fully give good faith disclosure of his knowledge of the problem.

 Under the record, the defendant's agreement to act in an advisory capacity cannot be extended so as to prohibit the defendant from engaging in other business enterprises, nor can it be enlarged upon to the extent of qualifying him as an agent for the plaintiff in its business operations after the merger of Fifteen with the plaintiff organization. Certainly, there is nothing in the advisory capacity letter which in any way obligates the defendant to advise the plaintiff of its legal obligations under the Martinez Lease. The defendant did not obligate himself to refrain from reminding the plaintiff of its legal obligation to his father and the other lessors of the Martinez 4000-acre lease. There is no language in the "Plan of Reorganization" or the "Certificate" executed by Fifteen which legally binds the defendant under the representations and warranties contained in the instruments. The representations and warranties in the instruments were those of Fifteen and not the defendant. Bogert on Trusts has vividly drawn the contrast between an ordinary contractual duty and a fiduciary duty. Bogert says in regard to a situation such as this that:

"* * * A fiduciary relation is one in which the law demands of one party an *unusually* high standard of ethical or moral conduct with reference to another. * * * *The ethics of ordinary business relations, where parties oppose each other at arm's length, do not apply to the trust. On account* of the intimate nature of the relationship, the great control of the trustee over the property of the beneficiary, the origin of the institution in the court of equity and other reasons, the trustee is expected to show *more than* ordinary candor, consideration, and probity in his dealings with the beneficiary." [Emphasis added.] Bogert, Trust and Trustees, § 1, at 3 (1951).

The plaintiff candidly admits that it has been unable to find a precise precedent in the sense of a case construing an agreement identical to the one here in issue. The plaintiff, however, cites, as analogous, such cases as Bradstreet Company v. Gill, 72 Tex. 115, 9 S.W. 753, 2 L.R.A. 405 (1888); Barnsdall Oil Company v. Willis, 152 F.2d 824 (5th Cir. 1946); Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720 (1938); and Patterson v. Getz, 166 Or. 245, 111 P.2d 842, 846 (1941). A close reading of these cases convinces us that the facts in each support the rule announced.

However, these cases are readily distinguishable from the present case. The facts in each established a fiduciary relationship which had been breached. There are no facts in the present case which would authorize applying the rule announced in the cases relied upon by the plaintiff. We cannot agree that the defendant's status was that of an agent, as defined by this Court in the case of Boyd v. Eikenberry, 132 Tex. 408, 122 S.W.2d 1045, 1047 (1939):

"[A]n agent is one who undertakes to transact some business, or to manage some affair for another, by the authority and on account of * * * it."

The defendant agreed to act in an advisory capacity. The word "advisory" means: "counseling, suggesting, or advising, but not imperative or conclusive." Black's Law Dictionary (Fourth Edition). The verb

"advise" means: "To give an opinion or counsel, or recommend a plan or course of action." Black's, supra. The Webster's New International Dictionary (Second Edition, 1961) defines "advisory" as "having or exercising power to advise; pertinent to or containing advice; acting under, or subject to, advice. * * *" and "advise" as "to give advice to; to recommend (a course of action) to; to counsel; warn. * * * To give information or notice to; to apprise; inform. * * *" All of the evidence shows that the defendant acted in accordance with his agreement.

■ As heretofore stated, the Court of Civil Appeals reversed and remanded the cause to the trial court for trial generally, rather than reversing the judgment of the trial court and rendering judgment for the defendant. Since the defendant filed no application for writ of error, this Court is without jurisdiction to grant him any relief from the judgment of the Court of Civil Appeals. See Vanover v. Henwood, 138 Tex. 348, 150 S.W.2d 785 (1941); Calvert, Some Problems of Supreme Court Review, 21 Tex.Bar Jour. 75. Therefore, we have no alternative but to affirm the judgment of the Court of Civil Appeals. It is so ordered. All costs are adjudged against the plaintiff.

CALVERT, C. J., and GRIFFIN, GREENHILL and POPE, JJ., dissenting.

GRIFFIN, Justice (dissenting).

Being of the opinion that a fiduciary relationship was established between Cain and Tennessee-Louisiana Oil Company, I cannot agree with the majority opinion, and file this dissent.

All emphasis herein supplied, when not otherwise stated is that of the writer of this opinion.

The Plan of Reorganization entered into between Fifteen Oil Company and Tennessee-Louisiana Oil Company provided in Art. 1.1 that Fifteen agrees to transfer to Company (Tennessee-Louisiana Oil Company) all of its assets and properties save and except Fifteen's corporate charter, by-laws, stock books and corporate seal and the sum of $5,000.00 in exchange for common stock of Tennessee Gas Transmission Company.

By Art. 4.2 of the Plan of Reorganization, Fifteen covenanted that it would cause Fifteen Oil Company to be liquidated and dissolved as promptly as possible after the closing date of the trade, and that after such dissolution, the company and Tennessee Gas Transmission Company should have all rights to the corporate name.

Cain, as president of Fifteen, warranted and covenanted in the Plan of Reorganization as follows: Art. 3.6, "* * * Fifteen's officers and directors do not now know nor do they have any basis for knowledge of, nor do they have any reason to anticipate, any litigation or other event or circumstance capable of producing consequences materially adverse to Fifteen *except as provided for in Article 5 hereof.*" Art. 5 of the Plan provided that all claims, contingencies and liabilities of Fifteen had been set forth in a schedule attached to the Plan, plus ordinary business operating expenses. The schedule attached showed nothing which would disturb Tennessee-Louisiana's title to the Martinez Lease.

Art. 3.10 of the Plan stated that all of Fifteen's leases, producing and non-producing, were in full force and effect and Fifteen had peaceable possession of the lands covered by the leases; that Fifteen was not in default in the performance of any of the terms and conditions of any such lease; [and] that *"Fifteen has no reason to anticipate the termination of any such leases."*

Art. 3.11 provides in part: "At closing date, Fifteen shall deliver to Company a certificate executed by its president on its behalf to the effect that to the best of the knowledge and belief of Fifteen's officers and directors, the oil and gas reserve information set forth in Exhibit H to the Memorandum was true and correct and

constituted all of the pertinent information then available having a material bearing upon the oil and gas reserves of Fifteen, and that *there is no fact or circumstances which would have a significant adverse effect upon the oil and gas reserves of Fifteen* * * * which fact or circumstance has not been made known to, or information forming the basis therefor made available to the proper authorized representative of the Company."

Art. 7.4 (conditions precedent to closing of trade) provides:

"7.4 None of the representations and warranties contained in Article 3 and the covenants contained in Section 4.1 (a) through (g) and the condition set forth in Section 6.3 of this Agreement shall be incorrect, untrue or breached in any material respect at Closing Date."

Art. 7.5 (conditions precedent to closing of trade) provides:

" * * * *and the certificate of Fifteen's president* and treasurer that to the best of the knowledge and belief of Fifteen's officers and directors, the oil and gas reserve information furnished to Company by Fifteen in the form of a Reserve Report as referred to in Section 3.11 hereof, was true and correct, and constituted all of the pertinent information then available having a material bearing upon the oil and gas reserves of Fifteen, and that *there is no fact or circumstance which would have a significant adverse effect upon the oil and gas reserves of Fifteen* or upon the reserve estimates in such Reserve Report delivered to Company and which fact or circumstance has not been made known to or information forming the basis therefor made available to the proper authorized representatives of Company."

A brief résumé of the facts will be helpful in determining whether or not Cain occupied a fiduciary relationship to Tennessee with regard to the Martinez Lease as would require Cain's conduct to be judged by the standards applied by courts of equity.

The Martinez Lease had been owned and operated from 1936 to 1956 by Mikton Oil Company, which was owned by Fifteen stockholders. During this time Cain was a director of Mikton. J. W. Cain, the father of Dixon H. Cain, had owned 25% of the minerals in the Martinez Lease since 1936. In 1957 Dixon H. Cain commenced handling his father's affairs.

In 1956 Fifteen acquired the assets of Mikton, which included the Martinez Lease. Dixon H. Cain was president of Fifteen from 1956 until the sale of Fifteen to Tennessee in 1960. By the Plan of Reorganization whereby Tennessee purchased Fifteen, including the Martinez Lease and all of Fifteen's cash assets, Fifteen acting through Dixon H. Cain as its president, and other authorized officers, made various representations and warranties to Tennessee. Dixon Cain et al. represented and warranted to Tennessee that they did not know or have any basis for knowledge or any reason to anticipate any litigation or other event or circumstance capable of producing consequences materially adverse to Fifteen; that at the time of closing the trade, all of Fifteen's leases were in full force and effect; that Fifteen was in peaceful possession of its lands and not in default in performance of any of the terms and conditions of its leases; and that Fifteen had no reason to anticipate the termination of any such leases.

On May 2, 1960, the date the transaction was closed, Dixon H. Cain, as president of Fifteen, joined by Fifteen's corporate secretary, executed a certificate in which it was stated "there is no fact or circumstance which would have a significant adverse effect upon the oil and gas reserves of Fifteen * * * and which fact or circumstance has not been made known to or information forming the basis thereof made available to the proper authorized representative of Company." This was in keeping with Art. 3.11 as above set out.

Under the plan of reorganization Tennessee was not employing Dixon H. Cain and two other officers of Fifteen. Although Tennessee was entitled to all the cash assets of Fifteen, under the plan of reorganization, it made an agreement as to payment by Fifteen of one and one-half years' severance pay to Dixon H. Cain and two other officers of Fifteen. Tennessee consented to this payment by Fifteen of severance pay "immediately prior to the effectuation of the exchange" from the cash of Fifteen on hand at closing date. This consent was as follows:

"In consideration of such severance payments to Messrs. Cain (et al) Fifteen obligates itself to obtain from them, letter agreement directed to Company to be delivered to Company at closing date that they and each of them will be available to Company in a retained advisory capacity for a period of six (6) months from and after the date of the exchange contemplated hereby in order that there will be no abrupt change in management and in order that Company may avail itself of their special knowledge covering the affairs and properties of Fifteen."

On May 2, 1960, the closing date, Dixon H. Cain signed a letter agreement addressed to Tennessee which referred to the plan of reorganization whereby he acknowledged receipt of payment by Fifteen of an amount equal to one and one-half times his current annual compensation. (Cain's severance pay was $57,500.00). This letter states that Cain "does hereby agree that he will be available to you (Tennessee) in a retained advisory capacity for a period of six (6) months from and after May 2, 1960, in order that there will be no abrupt change in management and in order that you may avail yourself of his special knowledge concerning the affairs and properties of Fifteen Oil Company."

Tennessee in this Court contends that this letter agreement and the facts and circumstances surrounding its execution caused a "fiduciary" or "confidential" relation to come into being as between Dixon H. Cain and Tennessee. Under this relation it is claimed Cain's conduct must be judged by high equitable standards and not by the standards required in dealings between ordinary parties. Kinzbach Tool Co., Inc. v. Corbett-Wallace Corporation, 138 Tex. 565, 160 S.W.2d 509, 514 (1942); Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786 (1938).

"A fiduciary relation, however, is not limited to cases of trustee and cestui que trust, guardian and ward, attorney and client, or other recognized legal relations, but it exists in all cases in which influence has been acquired and abused, *in which confidence has been reposed and betrayed.* The origin of the confidence is immaterial. It may be moral, social, domestic, or merely personal." Higgins v. Chicago Title & Trust Co., 312 Ill. 11, 143 N.E. 482 (1924).

"The expression 'fiduciary relation' is one of broad meaning, including both technical fiduciary relations and *those informal relations which exist whenever one man trusts and relies upon another.*" Reeves v. Crum, 97 Okl. 293, 225 P. 177 (1924).

"The term 'fiduciary' is derived from the civil law. It is impossible to give a definition of the term that is comprehensive enough to cover all cases. Generally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction. *The term includes those informal relations which exist whenever one party trusts and relies upon another, as well as technical fiduciary relations.*" (Citing many authorities.) Kinzbach Tool Co., Inc. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509, 512–513 (1942).

See also: 36A C.J.S. 381 et seq.

On October 19, 1960, and within the six-months period embraced in the letter agreement, Dixon H. Cain, purporting to represent his father, J. W. Cain, and twenty other lessors, wrote a letter to Tennessee in which he said, among other things:

"During the past ten years, you and your predecessors have not, to my knowledge, conducted any drilling operations, either exploratory or developmental, upon this property. * * *"

It will be remembered that the predecessors in title to the Martinez Lease were Dixon H. Cain's companies up to May 2, 1960, when Tennessee acquired title to the Martinez Lease in reliance upon Cain's representations and warranties contained in the plan of reorganization and also in the certificate signed by Cain May 2, 1960, and which were inducements to Tennessee to complete the purchase of Fifteen. Also, Cain had represented and warranted that Fifteen held peaceful possession of the leases and mineral interest sold to Tennessee and that he knew of no reason or claim that would affect the title to the properties conveyed. In order to get the $57,500.00 severance pay, Cain had signed the letter agreement whereby Tennessee retained Cain in an advisory capacity for six months in order to avail itself of his special knowledge of the properties of Fifteen.

Cain says that this letter was written only in behalf of his father, J. W. Cain, but in this letter calling on Tennessee to drill to 15,000 feet or surrender the Martinez Lease, he says: "This letter is written on behalf of the lessors as a demand for development or reassignment of the lease as provided by its own terms *and cannot be otherwise construed.*" Cain chose the language of the letter and cannot avoid it. Cain also sent copies of his letter to the twenty other lessors owning mineral interests in the Martinez Lease. Cain testified that when he sent this letter and the copies he was aware that he was taking a position against the interests of Tennessee.

In Louisiana the law requires a lessee of minerals to continue with development of a lease, or release the undeveloped part.

As a result of this letter, Tennessee lost all of the interest in the Martinez Lease purchased from Fifteen except 40 acres surrounding each producing well. Until Cain wrote his letter, none of the lessors or mineral interest owners in the Martinez tract had made any complaint or demand on Tennessee.

Within six months after the letter was written and Tennessee had released the Martinez Lease, Cain became the owner of the J. W. Cain interest and had sold minerals in excess of $40,000.00.

A recitation of Cain's conduct after he had agreed in return for the $57,500.00 to be available in an advisory capacity and to hold his special knowledge of Fifteen's leases available to Tennessee, demonstrates that such conduct was in direct violation of his agreement and of the duty he owed to Tennessee, and did not constitute a compliance with the duty he owed to Tennessee for fair dealing and good faith toward Tennessee and which the law required of him.

The meaning and effect of this letter agreement and of Dixon H. Cain's subsequent conduct is to be decided as a matter of law. However, the trial court submitted the following Special Issue No. One:

"Do you find from a preponderance of the evidence that by virtue of the Plan of Reorganization of Fifteen Oil Company and the Letter Agreement of May 2, 1960, between Dixon Cain and Tennessee Louisiana Oil Company, Dixon Cain agreed to act for Tennessee Louisiana Oil Company to the extent of remaining available in a retained advisory capacity for a period of six months from and after May 2, 1960, in order that there would be no abrupt change in management and in order that Tennessee might avail itself of his special knowledge concern-

ing the affairs and properties of Fifteen Oil Company?"

The jury answered this issue, "We do." Under the facts of this case an affirmative answer was established as a matter of law. The jury answered this issue in the only way it could have answered. Dixon H. Cain has contended throughout this litigation that the trial court erred in submitting this issue, because it submitted a question of law.

Having held that Dixon H. Cain, as a matter of law, occupied a relation to Tennessee which prevented him from acting adversely to Tennessee's interest with regard to the Martinez and other leases, Special Issue No. One, and the jury's answer thereto became immaterial. Ramm v. Ramm, Tex.Civ.App., 1956, 294 S.W.2d 174, writ refused, n. r. e.; American Mutual Liability Ins. Co. v. Parker, 144 Tex. 453, 191 S.W. 2d 844, 848 (1946); American Casualty & Life Co. v. Mason, Tex.Civ.App., 1951, 244 S.W.2d 691, writ refused, n. r. e.

I next come to Cain's contention that Tennessee should have no recovery against him because Tennessee has not been damaged in that (1) it did not pay the $57,-500.00 severance pay, but same was paid by Fifteen; (2) that Tennessee's loss of the Martinez Lease was the result of the Louisiana law and Tennessee's decision not to further develop the lease, therefore, Cain was guilty of no wrong in writing the letter of October 19, 1960; (3) that Cain only agreed to be available to Tennessee for its consultation with regard to Fifteen's properties, and Tennessee never called on Cain for information regarding the Martinez Lease; (4) that Tennessee should not have restitution of the $57,500.00, because to do so would unjustly enrich Tennessee; (5) that Tennessee could not recover any damages for loss of the Martinez Lease because it was lost as a matter of law and Cain's letter was not the cause of Tennessee's loss; and (6) Cain contends that there was animosity between him and Tennessee

and they dealt at arm's length, therefore, he owed no duty to Tennessee.

In answer to (1) above, it is true that Tennessee permitted Fifteen to pay out of its cash this sum to Cain and the purchase price paid was reduced by a like amount, but it is also true that Fifteen had contracted to deliver all of its cash except $5,000.00 to Tennessee, and it was necessary for Tennessee to consent to the use of the $57,500.00 by Fifteen in paying the severance payment to Cain. Cain recognized this when he, as president of Fifteen, signed the plan of reorganization and again when he signed and delivered the letter agreement of May 2, 1960, as a condition precedent to being paid the $57,500.00. He cannot now be heard to contest Tennessee's right to secure damages or restitution for Cain's violation of the letter agreement. See also statutes and authorities set out in the first part of this opinion regarding corporate mergers etc.

As to the restitution and damages features of this cause—(4) and (5)—Tennessee had sued for either restitution or damages. In answer to an issue inquiring of the jury "what sum of money would reasonably compensate Tennessee-Louisiana Oil Company for the damages which resulted from" Cain's action adverse to Tennessee during the six months Cain had agreed to serve in a retained advisory capacity, the jury found $60,000.00. In its motion for judgment, Tennessee remitted $2500.00 of this amount and asked for judgment for $57,500.00 damages, which was granted by the trial court.

> "It is worthy of notice that a tort may involve acts which also constitute a breach of contract, and that the same facts will sustain either an action ex delicto or ex contractu, so that an action ex delicto will lie, notwithstanding the act complained of would also be ground for an action ex contractu. Under this rule, it has been held that accompanying every contract there is a common-law duty to perform with

care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and the negligent failure to observe any of these conditions is a tort, as well as a breach of contract. Under such circumstances, the general rule is that the plaintiff may elect which to pursue." 52 Am.Jur. § 27.

"The word 'restitution' was used in the earlier common law to denote the return or restoration of a specific thing or condition. In modern legal usage, its meaning has frequently been extended to include not only the restoration or giving back of something to its rightful owner, but also compensation, reimbursement, indemnification or reparation for benefits derived from, or for loss or injury caused to another." 46 Am.Jur. § 99.

The court in Kinzbach Tool Co., Inc. v. Corbett-Wallace Corporation, 138 Tex. 565, 160 S.W.2d 509, 514 (1942) provides an answer to Cain's contention that Tennessee should not recover because it suffered no loss, when the court said:

"It is beside the point for either Turner or Corbett to say that Kinzbach suffered no damages because it received full value for what it has paid and agreed to pay. A fiduciary cannot say to the one to whom he bears such relationship: You have sustained no loss by my misconduct in receiving a commission from a party opposite to you, and therefore you are without remedy. It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired. * * *"

Contention (2) above is answered by the fact that prior to Cain's letter no lessor of the Martinez Lease had made any complaint as to Tennessee's title not being valid, nor was seeking a forfeiture of the lease. Tennessee had owned this lease a little over five months, but Cain had known all the details for more than fifteen years. In addition, he had represented to Tennessee that its title to Martinez was good. Having agreed to serve as advisor to Tennessee, Cain cannot be heard to say there was no wrong in putting in motion a chain of circumstances resulting in Tennessee's loss of the Martinez Lease.

Contention (3) is answered by the fact that Cain having written the letter seeking cancellation, it logically follows he could not thereafter be a faithful or trusted advisor of Tennessee so as to protect Tennessee's interest in this lease.

(6) As to dealing at arm's length with Tennessee, the record will support a finding *that the sale negotiations were carried on at arm's length,* but having arrived at a result leading to the consummation of the sale, and Cain having accepted Tennessee's terms under which the $57,500.00 was paid to him, he was not dealing at arm's length as to the retained advisory capacity. He had superior knowledge of Fifteen's properties sold to Tennessee, and with regard to these properties he owed Tennessee the duty to take no action adverse to its interests.

"When persons enter into fiduciary relations each consents, as a matter of law, to have his conduct towards the other measured by the standards of the finer loyalties exacted by courts of equity. That is a sound rule and should not be whittled down by exceptions. If the existence of strained relations should be suffered to work an exception, then a designing fiduciary could easily bring about such relations to set the stage for a sharp bargain. * * *" Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786 (1938).

"One occupying a fiduciary relationship to another must measure his conduct by high equitable standards, and not by the standards required in dealings between ordinary parties." (Citing authorities) Kinzbach Tool Co., Inc. v. Corbett-Wallace Corpora-

**332**

tion, 160 S.W.2d 509. Cain claims there was animosity between him and Tennessee which would prevent any fiduciary or confidential relationship coming into existence. The record fails to show any animosity up to closing of the trade. It shows that after the first attempt to make a trade with Tennessee failed, many of Fifteen's stockholders were dissatisfied that its officers had not closed a deal with Tennessee and insisted that the negotiations be reopened and a deal closed. It was partly in answer to this demand that further negotiations were begun which resulted in the final merger.

I would reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

CALVERT, C. J., and GREENHILL and POPE, JJ., join in this dissent.